# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| BRUCE RAPPAPORT, Derivatively on Behalf of Nominal Defendant CITRIX SYSTEMS INC., <br><br> Plaintiff, <br><br> vs. <br><br> ROGER W. ROBERTS, EDWARD E. IACOBUCCI, MICHAEL F. PASSARO, BRUCE C. CHITTENDEN, MARK B. TEMPLETON, STEPHEN M. DOW, ROBERT N. GOLDMAN, GREGORY B. MAFFEI, TYRONE F. PIKE, DAVID A.G. JONES, JOHN C. BURRIS, KEVIN R. COMPTON, DAVID D. URBANI, JOHN W. WHITE, JOHN P. CUNNINGHAM, ROBERT G. KRUGER, STEFAN SJOSTROM, KATE HUTCHISON, THOMAS F. BOGAN, GARY E. MORIN, MURRAY J. DEMO, GODFREY R. SULLIVAN, ASIFF HIRJI, DAVID J. HENSHALL, MARC-ANDRE BOISSEAU, and JAMES J. FELCYN, JR., <br><br> Defendants, <br><br> and <br><br> CITRIX SYSTEMS, INC., <br><br> Nominal Defendant. | Case No. 07-cv-60316-KAM |

## AMENDED VERIFIED DERIVATIVE COMPLAINT

Plaintiff Bruce Rappaport ("Rappaport" or "Plaintiff"), shareholder of Citrix Systems, Inc. ("Citrix" or the "Company"), alleges upon personal knowledge as to himself and his own acts, and upon information and belief and in reliance on the investigation of counsel as to all other matters, as follows:

## NATURE OF THE ACTION

1.      This is a shareholders derivative action brought for the benefit of Nominal Defendant Citrix against certain members of its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' violations of federal and state law, including breaches of fiduciary duty, abuse of control, constructive fraud, corporate waste, unjust enrichment and gross mismanagement between 1996 and 2007 (the "Relevant Period"). Defendants' violations arise from a scheme whereby defendants allowed senior Citrix executives to divert millions of dollars of corporate assets to themselves via the manipulation of grant dates associated with stock options granted to Citrix insiders.  Each of the defendants also failed to seek disgorgement of the senior insiders' illegally obtained compensation.

2.      The practice of backdating stock options was first publicly disclosed on March 18, 2006, when *The Wall Street Journal* (the "*Journal*") published an article entitled "The Perfect Payday," in which it described stock option backdating practices by a number of companies at which executives had achieved extremely fortuitous stock option paydays, the likelihood of which defied random chance. *The Journal*, together with finance professors Eric Lie ("Professor Lie"), of the Tippie College of Business at the University of Iowa, David Yermack, of New York University Stern School of Business, and Professor John Emerson, a statistician at Yale University, studied patterns of particularly favorable stock grants at certain companies and calculated the probability of such patterns occurring randomly and concluded that the odds were improbable.

3.      This practice of backdating stock options, though widespread, remained virtually undetected until such academic research revealed patterns of stock option grants that could not be explained by chance.  These studies noted the frequency with which stock option grants

occurred just after a drop in stock price and immediately before the price rose, often at the lowest price of the year.  Such timing could not be statistically explained by random selection of grant dates.  One study hypothesized that the dates of the grants had been selected retroactively.  Such retroactive dating, or "backdating" would permit the grantor to select the most advantageous price for the stock option and in effect create an "in the money" stock grant (one in which the actual stock price exceeds the option price on the day granted), that would appear as if it was granted while the stock price was low.  Since companies are required to report "in the money" grants as compensation to the recipient and as a charge to the corporation, the practice of backdating would provide a means to confer additional stock value, or compensation, to officers and employees that was not detectable, thereby permitting the Company to conceal the additional compensation and forego reporting or recording the charge.

4.     When the grant date of a stock option is backdated, the grantee pays less for the stock and the corporation, the counterparty to the stock option grant, receives less when the stock option is exercised.  When stock options are backdated in this manner for the benefit of insiders (as they were in this case), the stated purpose behind a stock option plan – to strengthen the Company's ability to retain key employees and motivate such employees to remain focused on long-term stockholder value performance – is undermined to the detriment of the Company and its shareholders, because the stock options are already "in the money"[1] when granted. Backdating stock option grants thus represents a direct and continuing waste of valuable corporate assets.

---

[1] "In the money" refers to when the exercise price of a stock option is below the market price of the underlying stock. *See* infra.

5.      Although the academic research did not identify specific companies that had engaged in these practices, it triggered increased scrutiny by the Securities and Exchange Commission (the "SEC") and other government officials.

6.      For example, on September 6, 2006, the United States Senate Committee on Finance ("Finance Committee") held a hearing on "Executive Compensation: Backdating to the Future/Oversight of current issues regarding executive compensation including backdating of stock options; and tax treatment of executive compensation, retirement and benefits." At the hearing, Former Finance Committee Chairman, Senator Chuck Grassley, in his opening statement, stated: "[options backdating] is behavior that, to put it bluntly, is disgusting and repulsive.  It is behavior that ignores the concept of an 'honest day's work for an honest day's pay' and replaces it with a phrase that we hear all too often today, 'I'm going to get mine.' . . . [S]hareholders and rank-and-file employees were ripped off by senior executives who rigged stock option programs – through a process called 'back-dating' – to further enrich themselves. And as we have found far too often in corporate scandals of recent years, boards of directors were either asleep at the switch, or in some cases, willing accomplices themselves. . . ."

7.      Furthermore, the scrutiny on the practice of backdating stock options has entered into the criminal arena as well.  For instance, Gregory L. Reyes ("Reyes"), the Chief Executive Officer ("CEO") of Brocade Communications Systems ("Brocade"), was convicted in the United States District Court for the Northern District of California on August 7, 2007 of 10 felonies, including conspiracy and securities fraud, for his role in a stock options backdating scheme, and is awaiting sentencing which may exceed ten years.  Shortly before the jury verdict, in an August 3, 2007 Order denying Reyes' motion for a judgment of acquittal, the Court described the charges against Reyes as follows: "the backdating practice is the basis for the charges that Reyes

4

participated in a criminal conspiracy (Count One), engaged in a scheme to defraud investors (Count Two), made false filings with the Securities and Exchange Commission (Counts Five, Six, and Seven), kept false books and records (Count Eight), and made false statements to the company's accountants (Counts Nine, Ten, Eleven, and Twelve)." *U.S. v. Reyes*, No. C 06-00556 CRB at *2 (N.D.C.A. August 3, 2007).  In finding that the prosecution's allegations concerning the backdating scheme satisfied the materiality requirement of the charges, the Court noted the following:

> In other words, based on the evidence presented during the prosecution's case-in-chief, a reasonable jury could conclude, beyond a reasonable doubt, that there is a substantial likelihood that [the understatement of Brocade's compensation expenses] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available. (citations and internal quotations omitted).  *Id.* at *6.

8.      This action arises from the Defendants' repeated and egregious breaches of their fiduciary duties to the Company and its shareholders by approving and/or acquiescing in the issuance of Citrix stock options to Company employees and directors that were unlawfully "backdated" to provide the recipients with windfall compensation at the direct expense of the Company.

9.      To achieve the Company's stated goal of strengthening the Company's ability to retain key employees and motivating such employees to remain focused on long-term stockholder value performance, Citrix's shareholder-approved stock option plans provide that the exercise price of a stock option must be equal to the fair market value of the stock on the date of grant of the option.  At Citrix, however, the Defendants blatantly violated this and other provisions of the Company's stock option plans by backdating Citrix stock options in order to illegally maximize the grantees' profits.  As such, and as detailed below, the Defendants' acts were *ultra vires* – unauthorized and beyond the scope of power granted to them.

10.     As alleged in detail herein, in gross breach of their fiduciary duties as officers and/or directors of Citrix, the Defendants (as defined herein) colluded with one another to:

A.      improperly backdate grants of Citrix stock options to several Company executives in violation of the Company's shareholder-approved stock option plans;

B.      improperly record and account for the backdated stock options, in violation of Generally Accepted Accounting Principles ("GAAP");

C.      improperly take tax deductions based on the backdated stock options, in violation of Section 162(m) of the Internal Revenue Code, 26 U.S.C. § 162(m) ("Section 162(m)"); and

D.      produce and disseminate false financial statements and other SEC filings to Citrix shareholders and the market that improperly recorded and accounted for the backdated stock option grants and concealed the improper backdating of stock options.

11.     As a result of defendants' misconduct, Citrix has sustained millions of dollars in damages, while the recipients of the backdated stock options have reaped millions of dollars in unlawful profits.

12.     Specifically, as a result of defendants' unlawful backdating scheme, the Company admitted that it "had used incorrect measurement dates for accounting purposes for certain historical stock option grants issued," and that it would incur a pretax cumulative charge of ***$165.7 million*** in its historical financial statements through December 31, 2005 to reflect additional stock-based compensation expenses.

13.     In addition, the Company was forced to restate its financial results from fiscal years 2004 and 2005 and for the interim quarterly periods for 2005 and 2006 to reflect the additional non-cash stock-based compensation expenses and related tax effects that should have been recorded with respect to stock option grants whose accounting measurement dates were improperly set.

6

14.     Lead Plaintiff brings this action derivatively on behalf of Citrix to seek redress for the harm defendants have caused the Company by their *ultra vires* acts and breaches of fiduciary duty, for cancellation of the unlawfully granted stock options, and for disgorgement of benefits improperly received.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

16.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district.  One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## PARTIES

### Plaintiff

17.     Plaintiff Rappaport is a current shareholder of Nominal Defendant Citrix, and first purchased Citrix common stock in December of 1999.

### Defendants

### Nominal Defendant

18.     Nominal Defendant Citrix is a Delaware corporation with its principal executive offices located at 851 West Cypress Creek Road, Fort Lauderdale, Florida 33309.  According to

its public filings, Citrix engages in the design, development, and marketing of technology solutions that enable on-demand access to information and applications in the United States.  The Company offers infrastructure software and services for applications and online services.  At all relevant times, Citrix common stock was listed on the NASDAQ national market under the symbol "CTXS".

**Defendants**

*Current Executive and Director Defendants*

19.     Defendant Mark B. Templeton ("Templeton") has served as President of the Company since January 1998 and as CEO since June 2001. Templeton also served as CEO of the Company from January 1999 to June 2000 and as Senior Executive Officer of the Company from July 2000 to May 2001.  He has served as a director of the Company from May 1998 to the present.

20.     Defendant John C. Burris ("Burris") has served as Senior Vice President, Sales and Services of the Company since January 2001.  From July 1999 to January 2001, Burris served as Senior Vice President, Services of the Company.

21.     Defendant David J. Henshall ("Henshall") has served as Senior Vice President and CFO of the Company since January 2006.  From April 2003 to January 2006, Henshall served as Vice President and CFO of the Company.

22.     Defendant David D. Urbani ("Urbani") has served as the Vice President, Finance since April of 2003.  From May 2002 to April 2003, he also served as Acting Chief Financial Officer ("CFO").  Urbani joined the Company in March 2000 as Vice President and Corporate Controller, and served as Treasurer of the Company from June 2000 to October 2001.

23.     Defendant David A.G. Jones ("Jones") has served as the Company's Senior Vice President, Corporate Development since January 2001.  Jones joined the Corporation in October 1998 as Vice President, International.

24.     Defendant Stefan Sjostrom ("Sjostrom") has served as Vice President, EMEA (i.e., Europe, Middle East and Africa) Sales and General Manager of the Company since March 2001.  Sjostrom is also a director of one of Citrix's European subsidiaries.

25.     Defendant Kate Hutchison ("Hutchison") joined the Company as Senior Vice President, Corporate Marketing in December 2002, and continues to serve in that capacity at the Company.

26.     Defendant Thomas F. Bogan ("Bogan") has served as a director of the Company since January 2003.  Bogan has also served as Chairman of the Compensation Committee since 2003 and as Chairman of the Board since May 2005.

27.     Defendant Murray J. Demo ("Demo") has served as a director of the Company since February 2005.  Demo has also served as a member of the Audit Committee since 2005.

28.     Defendant Stephen M. Dow ("Dow") has served as a director of the Company since 1989 and served as Chairman of the Board from May 2002 to May 2005.  In addition, Dow was a member of the Audit Committee from 2001 to 2006, and has served as a member of the Company's Compensation Committee from 1997 through 2002, and again in 2007.

29.     Defendant Asiff Hirji ("Hirji") has served as a director of the Company since May 2006.  Hirji has also served as a member of the Audit Committee since 2006.

30.     Defendant Gary E. Morin ("Morin") has served as a director of the Company since January 2003.  Morin has also served as the Chairman of the Audit Committee since 2003.

9

31.     Defendant Godfrey R. Sullivan ("Sullivan") has served as a director of the Company since February 2005.  Sullivan has also served as a member of the Compensation Committee since 2005.

*Former Executive and Director Defendants*

32.     Defendant Roger W. Roberts ("Roberts") served as a director of Citrix from June 1990 through May 2002 and as Chairman of the Board from June 2000 through May 2002.  He also served as Chief Operating Officer ("COO") of the Company from June 2000 to June 2002, as CEO of the Company from June 1990 until December 1998, and served as President of the Company from June 1990 until January 1998.  Roberts left the Company in May 2002.

33.     Defendant Edward E. Iacobucci ("Iacobucci"), co-founder of Citrix, served as a director from the Company's inception in 1989 until June 2000 and as Chairman of the Board from September 1991 until June 2000.  In addition, from the Company's inception until April 1999, Iacobucci served as Chief Technical Officer and Vice President, Strategy & Technology. In April 1999, Iacobucci was promoted to Senior Vice President, Strategy & Technology. Iacobucci relinquished all positions with the Company in June 2000.

34.     Defendant Michael F. Passaro ("Passaro") joined Citrix in October 1992 as Vice President, Worldwide Sales and Services.  Passaro retired from the Company in December 1998.

35.     Defendant Bruce C. Chittenden ("Chittenden") joined Citrix in 1993 as Vice President, Engineering.  Chittenden left the Company in November 2000.

36.     Defendant John P. Cunningham ("Cunningham") joined Citrix as its CFO, Senior Vice President, Finance and Administration, and Assistant Secretary in November 1999. Cunningham was promoted to Senior Vice President, Finance and Operations in May 2001. Cunningham left the Company in June 2002.

37.     Defendant Robert G. Kruger ("Kruger") joined Citrix in April 2001 as Chief Technology Officer.  In June 2001, Kruger was also promoted to Senior Vice President, Product Development, a position he held until January 2005.  Kruger left the Company in January 2005.

38.     Defendant Marc-Andre Boisseau ("Boisseau") joined the Company in 1995 as its Corporate Controller.  From May 1997 through the end of 1999, Boisseau served as the Chief Accounting Officer.  Boisseau left the Company in December 1999.

39.     Defendant James J. Felcyn, Jr. ("Felcyn") joined the Company as its Chief Financial Officer, Vice President – Finance and Administration, and Treasurer in July 1994. Felcyn served in that capacity until he left the Company in January 2000.

40.     Defendant Kevin R. Compton ("Compton") served as a director of the Corporation from March 1991 through February 2005.  Compton also served on the Company's Audit Committee and the Compensation Committee from 1996 through 2001.  Compton left the Company in February 2005.

41.     Defendant Robert N. Goldman ("Goldman") served as a director of the Company from 1995 through May 2002.  Goldman also served on the Company's Audit Committee from 1996 through 2001.  Goldman left the Company in May 2002.

42.     Defendant Gregory B. Maffei ("Maffei") served as a director of the Company during from February 1994 through July 1997.  Maffei served on the Audit Committee during the Relevant Period in 1997.  He left the Company in July 1997.

43.     Defendant Tyrone F. Pike ("Pike") served as a director of the Corporation from 1993 through February 2005.  Pike served on the Company's Audit Committee from 2003 through 2004.  Pike left the Company in February 2005.

44.     Defendant John W. White ("White") served as a director of the Company from July 1998 to May 2006.  White served on the Company's Compensation Committee from 2001 through 2006.  White retired from the Company in May 2006.

45.     Collectively, the defendants listed in paragraphs 20 through 45 above are referred to herein as the "Defendants."

## DUTIES OF THE DEFENDANTS

46.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.

47.     Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

48.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

> a.     exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;
>
> b.     exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority;

c.      exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the Company;

d.      exercise good faith in ensuring that the Company's financial statements were prepared in accordance with GAAP; and

e.      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

49.    Defendants breached their duties of loyalty and good faith by allowing or by causing the Company to represent its financial results, and by failing to prevent Defendants from taking illegal actions.  As a result, Citrix will expend significant sums of money such as: (a) illegally paid executive compensation; (b) increased capital costs as a result of the loss of market capitalization and the Company's damaged reputation; (c) costs incurred to carry out internal investigations; and (d) incurring possible IRS penalties for improperly reporting compensation.

50.    Defendants were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information.  According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure.  Among other things, Defendants were required to:

(1)    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

(2)    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

(a)    transactions are executed in accordance with

management's general or specific authorization;

(b)    transactions are recorded as necessary to permit preparation of financial statements in conformity with [GAAP].

51.    Citrix's Audit Committee Charter provides that the Audit Committee's primary function is as follows:

[T]o oversee the accounting and financial reporting processes of the [Company] and the audits of the financial statements of [Citrix] and to exercise the responsibilities and duties set forth below, including, but not limited to:

A.    assisting the Board of Directors in fulfilling its responsibilities by reviewing:

i.    the financial reports provided by [Citrix] to the [SEC], the [Company's] shareholders or to the general public; and

ii.    the [Company's] internal financial and accounting controls;

B.    overseeing the appointment, compensation, retention and oversight of the work performed by any independent public accountants engaged by [Citrix];

C.    overseeing procedures designed to improve the quality and reliability of the disclosure of the [Company's] financial condition and results of operations;

D.    serving as the Qualified Legal Compliance Committee (the "QLCC") in accordance with Section 307 of the Sarbanes-Oxley Act of 2002 and the rules and regulations promulgated by the SEC thereunder;

E.    recommending, establishing and monitoring procedures designed to facilitate:

i.    the receipt, retention and treatment of complaints relating to accounting, internal accounting controls or auditing matters; and

ii.    the receipt of confidential, anonymous submissions by employees of concerns regarding questionable accounting or auditing matters;

F.    engaging advisors as necessary; and

G.      determining the funding from the Corporation that is necessary or appropriate to carry out the Committee's duties.

52.     Additionally, Citrix's Compensation Committee Charter provides that the primary function of the Compensation Committee is "to exercise the responsibilities and duties set forth below, including, but not limited to, determining and making recommendations with respect to all forms of compensation to be granted to directors, executive officers and employees of the [Company] and producing an annual report on executive compensation for inclusion in the [Company's] proxy statement for its Annual Meeting of Stockholders in accordance with applicable rules and regulations."

53.     In addition, the Compensation Committee "shall review and make recommendations to management on company-wide compensation programs and practices; recommend, subject to approval by the full Board, the salary, bonus, equity and other compensation arrangements of the [Company's] Chief Executive Officer; approve the salary, bonus, equity and other compensation arrangements of other senior executive officers reporting directly to the Chief Executive Officer; and recommend, subject to approval by the full Board, any equity-based plans and any material amendments thereto (including increases in the number of shares of Common Stock available for grant as options or otherwise thereunder) for which stockholder approval is required or desirable."   The Compensation Committee's specific responsibilities include, *inter alia*:

A.      Review the terms and conditions of compensation plans, including the Corporation's equity-based plans; determine the eligibility requirements applicable to participants in each such plan, as may be required by the terms of a plan; evaluate the performance of each benefit plan and all fiduciaries of the plans; make such amendments to the plans and take such actions in regard to the plans as the Committee deems appropriate;

B.      Evaluate the Corporation's incentive compensation plans, including the Corporation's equity-based plans, to allow the Corporation to attract and

15

retain the talented personnel it needs to become successful. Recommend such plans to the Board for approval and take actions that may be necessary or advisable to implement and administer the Corporation's incentive compensation plans, all in accordance with the terms of such plans;

C.  Evaluate director compensation, recommend to the full Board the appropriate level of director compensation, and take primary responsibility for ensuring that any payments to directors other than in their capacity as directors are fully and properly disclosed;

D.  Review and discuss with management the Corporation's philosophy, processes and procedures for the consideration and determination of director and executive compensation and the Compensation Discussion and Analysis to be included in the Corporation's proxy statement or annual report. Based on the Committee's review and discussion with management, it shall make a recommendation to the Board of Directors that the Compensation Discussion and Analysis be included in the Corporation's proxy statement or annual report;

E.  Prepare the Compensation Committee Report for inclusion in the Corporation's proxy statement for its Annual Meeting of Stockholders in accordance with applicable rules and regulations; and

F.  Determine whether an investigation is necessary regarding any report of evidence of a Material Violation that is reported to the Committee by the Corporation's chief legal officer (or the equivalent thereof) or other legal advisors.

G.  Exercise such additional powers and duties as may be reasonable necessary or desirable, in the Committee's discretion, to fulfill its duties under this Charter.

54.  The following is a list of the members of the Company's Compensation Committee and Audit Committee during the Relevant Period:

| Citrix Systems | | |
|---|---|---|
| **Members of Compensation and Audit Committees** | | |
| (Note: Chairpersons not disclosed until 2006 proxy) | | |
| | | |
| **Date of Proxy** | **Compensation Committee** | **Audit Committee** |
| | | |
| 9/17/2007 | Thomas F. Bogan (Chair) | Murray J. Demo |
| | Stephen M. Dow | Asiff Hirji |
| | Godfrey R. Sullivan | Gary E. Morin (Chair) |
| | | |

| 4/14/2006 | Thomas F. Bogan (Chair) | Murray J. Demo |
| | Godfrey R. Sullivan | Stephen M. Dow |
| | John W. White | Gary E. Morin (Chair) |
| | | |
| 4/1/2005 | Thomas F. Bogan | Murray J. Demo |
| | Godfrey R. Sullivan | Stephen M. Dow |
| | John W. White | Gary E. Morin |
| | | |
| 4/2/2004 | Thomas F. Bogan | Stephen M. Dow |
| | John W. White | Gary E. Morin |
| | Kevin R. Compton | Tyrone F. Pike |
| | | |
| 4/4/2003 | Thomas F. Bogan | Stephen M. Dow |
| | John W. White | Gary E. Morin |
| | Kevin R. Compton | Tyrone F. Pike |
| | | |
| 4/1/2002 | John W. White | Robert N. Goldman |
| | Kevin R. Compton | Kevin R. Compton |
| | Stephen M. Dow | Stephen M. Dow |
| | | |
| 4/9/2001 | John W. White | Robert N. Goldman |
| | Kevin R. Compton | Kevin R. Compton |
| | Stephen M. Dow | Stephen M. Dow |
| | | |
| 5/18/2000 | Kevin R. Compton | Kevin R. Compton |
| | Stephen M. Dow | Robert N. Goldman |
| | | |
| 4/2/1999 | Kevin R. Compton | Kevin R. Compton |
| | Stephen M. Dow | Robert N. Goldman |
| | | |
| 4/3/1998 | Kevin R. Compton | Kevin R. Compton |
| | Stephen M. Dow | Robert N. Goldman |
| | | |
| 4/4/1997 | Kevin R. Compton | Kevin R. Compton |
| | Stephen M. Dow | Robert N. Goldman |
| | | Gregory B. Maffei |

## AIDING AND ABETTING AND CONCERTED ACTION

55.     In committing the wrongful acts alleged herein, Defendants have pursued a common course of conduct and acted in concert with one another in furtherance of their common plan.

17

56.     During all times relevant hereto, Defendants collectively and individually initiated a course of conduct which was designed to and did: (i) conceal the fact that the Company was allowing its directors and senior officers to divert material amounts of money to insiders and was misrepresenting its financial results; (ii) maintain Defendants' executive and directorial positions at Citrix and the benefits associated with those positions; (iii) deceive the investing public regarding Citrix's compensation practices and Citrix's financial performance.

57.     The purpose and effect of Defendants' common course of conduct was, among other things, to disguise Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, corporate waste and unjust enrichment, to conceal adverse information concerning the Company's operation and financial condition and to artificially inflate the price of Citrix stock so they could dispose of millions of dollars of their own Citrix stock.

58.     Defendants accomplished their common enterprise and/or common course of conduct by causing the Company to purposefully and/or recklessly engage in the option backdating scheme alleged herein and misrepresent Citrix's financial results.  Each of the Defendants was a direct, necessary and substantial participant in the common enterprise and/or common course of conduct complained of herein.

59.     Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

**FACTUAL ALLEGATIONS**

18

## Background to the Stock Option Backdating Scandal

60.     Under accounting rules in effect prior to 2004, public companies in the United States were permitted to grant stock options to employees without recording an expense, so long as the option's strike price was at or above the market's closing price for the stock on the day the options were granted.  If the option granted was priced below the market price on the date granted, known as an "in the money" option grant, SEC regulations required that any publicly traded company recognize and record the difference as a compensation expense in its financial statements.  *See, e.g*., APB 25, superseded in 2004 by FAS 123(R).[2]  Accounting rules also required that companies recognize the same compensation expense if "in the money" options were granted to non-employees.  Thus while "in the money" stock options are more valuable to those to whom they are granted, the additional expenses, if disclosed, reduce the total amount of net income reported to shareholders of a publicly traded company.

61.     In addition, pursuant to Section 162(m), compensation in excess of $1 million per year, including gains on stock options, paid to a corporation's most highly compensated officers is tax deductible only if: (i) the compensation is payable solely on account of the attainment of one or more performance goals; (ii) the performance goals are determined by a compensation committee comprised solely of two or more outside directors, (iii) the material terms under which the compensation is to be paid, including the performance goals, are disclosed to shareholders and approved by a majority of the vote in a separate shareholder vote before the payment of the compensation, and (iv) before any payment of such compensation, the

---

[2] Pursuant to Accounting Principles Board Opinion No. 25 ("APB 25), the applicable GAAP provision at the time of the stock option grants enumerated herein, if the market price on the date of grant exceeds the exercise price of the options, the Company must recognize the difference as an expense.

compensation committee certifies that the performance goals and any other material terms were in fact satisfied.

62.     Since the date of the *Journal* article which first revealed the illegal practice of backdating stock options, more than 130 companies have reported internal and/or governmental investigations of their backdating practices.  *Perfect Payday Options Scorecard*, *The Wall Street Journal* (updated regularly, available at http://online.wsj.com/public/resources/documents/info-optionsscore06-full.html).

63.     Additional research by Professor Lie suggests that between 1996 and 2005, 18.9% of unscheduled "in the money" option grants to top executives were backdated or manipulated, by nearly one-third of the companies investigated.

64.     Revelations of backdated stock options have been made by companies across several business sectors and geographic regions.  A disproportionate number of these revelations, however, have come from technology companies in Silicon Valley, where stock options are frequently used to attract employees and increasingly lavished upon executives.  Rank and file employees who received backdated options have now found themselves subject to unforeseen tax liabilities and, in some instances, barred from exercising their own vested securities.  As reported by the San Jose Mercury News:

> Across Silicon Valley and the nation, hundreds of thousands of workers who played no role in manipulating options nonetheless could pay a price, from lost stock options and lost investment opportunities to looming tax bills.  And dozens of companies have imposed indefinite "blackout" periods …. While companies struggle to restate past earnings and report current financial results.

Mark Schwanhausser, *Average Worker Takes A Hit: Tax Bill Headaches Looming For Rank-and-File*, San Jose Mercury News, January 29, 2007, available online at http://www.mercurynews.com/search/ci_5110094.

65.     As the scrutiny has intensified, backdating has been revealed not only as a practice to maximize the grant recipients' gain, while concealing company expenses, but also as a tax avoidance vehicle for some executives.  Reporting on an analysis written by an economist at the SEC, the San Jose Mercury News reported, "[i]n a new wrinkle in the scandal over backdating stock options, an analyst has found evidence that some executives manipulated the exercise dates of their options in order to cheat on their taxes."  Marcy Gordon, SEC: Backdating Done to Avoid Paying More Taxes, San Jose Mercury News, December 13, 2006, available online at http://www.mercurynews.com/search/ci_4831931.

66.     For at least the past decade, stock options have been a popular form of executive compensation, supposedly because they help align executive interests with those of the shareholders.  Unfortunately, in practice, the granting of stock options to senior management frequently did not have the desired effect.  Far too frequently, options sometimes caused managers to look for ways to drive up stock prices in the short term through acquisitions, asset sales, or even fraud, rather than by effectively managing existing businesses for long term success, as many shareholders would prefer.

67.     Although compensation experts continue to debate whether or not these risks outweigh the incentives stock options are intended to provide, the use of stock options as another place to hide lavish and unprecedented executive compensation has become readily apparent in recent years.

68.     Specifically, beginning in March 2006 and continuing through the present, numerous companies have been revealed to have participated in options backdating.  While executives are benefited through options backdating by giving them the ability to exercise those options at lower prices than they otherwise could, such fraudulent and illegal schemes

disadvantage the issuer of the stock by, among other things, bringing less money into the company upon the exercise of the options.

69.     Additionally, although companies may take tax deductions for option-related expense when the options are exercised, any amounts that bring compensation for certain individuals over $1 million in any year are deductible only if the expense is "performance-related."   Awards of "in-the-money" stock options do not qualify as "performance-related" compensation for these purposes, and therefore expenses relating to the exercise of those options (the market price on the exercise date less the exercise price) are not deductible.  By backdating option grants and deducting options-related expense associated with the exercise of those options, companies increase their tax liabilities at the time the options are exercised and may be subject to penalties as a result.

70.     The fall-out from options backdating scandals has already resulted in criminal charges against corporate executives from several companies, while investigations by the SEC and federal prosecutors are ongoing with respect to numerous other companies.

**Summary of Citrix Stock Option Plans Operative During the Relevant Period**

71.     According to the Company, stock options are issued pursuant to incentive Stock Option Plans (the "Plans") approved by Company shareholders and administered by the Board and the Compensation Committee.  Each of Citrix's reported Plans in effect during the Relevant Period provides that the measurement of the exercise price of stock options was to be based on the fair market value on the date the option was granted.  The Company's relevant various stock option and other compensation plans are summarized in Citrix's financial filings as follows:

**1995 Stock Plan**

72.     As described in the Company's Annual Report on Form 10-K for fiscal year 1996, the essential features of the 1995 Stock Plan are as follows:

Under the 1995 Plan, ***incentive stock options may be granted at no less than market value at the date of grant***, except for incentive stock options granted to employees who own more than 10% of the Company's combined voting power, for which the exercise prices will be no less than 110% of the market value at the date of grant.

### 1995 Non-Employee Director Stock Option Plan

73.     As described in the Company's Annual Report on Form 10-K for fiscal year 1996, the essential features of the 1995 Non-Employee Director Stock Option Plan are as follows:

All options granted under the Director Option Plan ***will have an exercise price equal to the fair market value of the Common Stock on the date of the grant***.

74.     As described in the Company's Annual Proxy Statement filed on March 10, 1999, the Company's Plans were all administered by the Compensation Committee.

75.     The 1995 Stock Plan and the 1995 Non-Employee Director Plan each defined "fair market value" as:

A.      the average (on that date) of the high and low prices of the Common Stock on the principal national securities exchange on which the Common Stock is traded; or

B.      the last reported sale price (on that date) of the Common Stock on the Nasdaq Stock Market, if the Common Stock is not then traded on a national securities exchange; or

C.      the closing bid price (or average of bid prices) last quoted (on that date) by an established quotation service for over-the-counter securities, if the Common Stock is not reported on the Nasdaq Stock Market.

### The Amended and Restated 1995 Stock Plan

76.     In 2001, the Company adopted the Amended and Restated 1995 Stock Plan.  As described in the Company's Annual Report on Form 10-K for fiscal year 2001, the essential features of the Amended and Restated 1995 Stock Plan are as follows:

23

The Plan shall be administered by the Board of Directors of the Company, or by a committee appointed by the Board (the "Committee"), provided that the Plan shall be administered (i) to the extent required by applicable regulations under Section 162(m) of the [Internal Revenue] Code, by two or more "outside directors" and (ii) to the extent required by Rule 16b-3 promulgated under the Securities Exchange Act of 1934 or any successor provision, by a disinterested administrator or administrators within the meaning of Rule 16b-3.

* * *

The exercise price per share specified in the agreement relating to each [incentive stock option] granted under the Plan *shall not be less than the fair market value per share of Common Stock on the date of such grant*. In the case of an [incentive stock option] to be granted to an employee owning stock possessing more than ten percent (10%) of the total combined voting power of all classes of stock of the Company or any Related Corporation, the price per share specified in the agreement relating to such [incentive stock option] shall not be less than one hundred ten percent (110%) of the fair market value per share of Common Stock on the date of grant.

### The Amended and Restated 1995 Non-Employee Director Stock Option Plan

77.     In 2001, the Company adopted the Amended and Restated 1995 Non-Employee Director Stock Option Plan.  As described in the Company's Annual Report on Form 10-K for fiscal year 2001, the essential features of the Amended and Restated 1995 Non-Employee Director Stock Option Plan are as follows:

This Plan shall be administered by the Board or by a committee appointed by the Board.

* * *

The purchase price of the stock covered by an option granted pursuant to this Plan shall be *100% of the fair market value of such shares on the day the option is granted*.

78.     The Amended and Restated 1995 Stock Plan and the Amended and Restated 1995 Non-Employee Director Plan each defined "fair market value" as:

A.     the average (on that date) of the high and low prices of the Common Stock on the principal national securities exchange on which the Common Stock is traded; or

24

      B.      the last reported sale price (on that date) of the Common Stock on the Nasdaq Stock Market, if the Common Stock is not then traded on a national securities exchange; or

      C.      the closing bid price (or average of bid prices) last quoted (on that date) by an established quotation service for over-the-counter securities, if the Common Stock is not reported on the Nasdaq Stock Market.

**The Second Amended and Restated 1995 Non-Employee Director Stock Option Plan**

79.    Effective January 1, 2002, the Company adopted the Second Amended and Restated 1995 Non-Employee Director Stock Option Plan.  As described in the Company's Annual Report on Form 10-K for fiscal year 2002, the essential features of the Second Amended and Restated 1995 Non-Employee Director Stock Option Plan are as follows:

This Plan shall be administered by the Board or by a committee appointed by the Board.

* * *

The purchase price of the stock covered by an option granted pursuant to this Plan shall be ***100% of the fair market value of such shares on the day the option is granted***.

80.    The Second Amended and Restated 1995 Non-Employee Director Plan defined "fair market value" as:

      A.      the average (on that date) of the high and low prices of the Common Stock on the principal national securities exchange on which the Common Stock is traded; or

      B.      the last reported sale price (on that date) of the Common Stock on the Nasdaq Stock Market, if the Common Stock is not then traded on a national securities exchange; or

      C.      the closing bid price (or average of bid prices) last quoted (on that date) by an established quotation service for over-the-counter securities, if the Common Stock is not reported on the Nasdaq Stock Market.

**The 2000 Director and Officer Stock Option Plan**

81.     As described in the Company's Annual Report on Form 10-K for fiscal year 2000, in 2000, the Company adopted the 2000 Director and Officer Stock Option and Incentive Plan, pursuant to which incentive stock options "***must be granted at exercise prices no less than market value on the date of grant***."   The Director and Officer Stock Option Plan defined "fair market value" as:

> A.     the average (on that date) of the high and low prices of the Common Stock on the principal national securities exchange on which the Common Stock is traded; or
>
> B.     the last reported sale price (on that date) of the Common Stock on the Nasdaq Stock Market, if the Common Stock is not then traded on a national securities exchange; or
>
> C.     the closing bid price (or average of bid prices) last quoted (on that date) by an established quotation service for over-the-counter securities, if the Common Stock is not reported on the Nasdaq Stock Market.

### The 2005 Equity Incentive Plan

82.     In 2005, the Company adopted the 2005 Equity Incentive Plan.  As described in the Company's Annual Report on Form 10-K for fiscal year 2005, the essential features of the 2005 Equity Incentive Plan are as follows:

> Under the 2005 Plan, ***incentive stock options may be granted at no less than market value at the date of grant***, except for incentive stock options granted to employees who own more than 10% of the Company's combined voting power, for which the exercise prices will be no less than 110% of the market value at the date of grant.

### <u>Analysis of Grants Awarded During the Relevant Period</u>

83.     During the Relevant Period, several discretionary options grants to multiple executives and directors and disclosed in the Company's proxy statements were backdated, as the pattern of grants was more than fortuitous and often fell on days in which the Company's stock traded at or near period lows.

84.     In addition to the academic research that has extensively covered the prevalence of backdating schemes in recent years, Merrill Lynch & Co., Inc. ("Merrill Lynch") has built upon such research in developing a method of analyzing options grants and comparing the returns from such grants to the average investor returns in the same period as a strong indicator of whether backdating likely occurred.  To that end, Merrill Lynch published an analysis of options grants made at various companies in a report dated May 22, 2006 as further evidence that the returns enjoyed by options grantees at many companies were not by mere chance.  The report analyzes the twenty day performance of each option grant reported in a company's proxy statements during the relevant backdating period.  The analysis also calculates the annualized return of the option grants at twenty days after the grant and compares that annualized return with the company's overall annual return.[3]

85.     An application of the Merrill Lynch analysis for the discretionary grants made to Defendants during the Relevant Period further indicates that the grants were very likely to have been backdated, given the vast discrepancies between the annualized management and annualized investors returns.

86.     During the Relevant Period, the Compensation Committee and the Board knowingly and deliberately violated the terms of the Plans, APB 25 and Section 162(m) by knowingly and deliberately backdating grants of stock options to make it appear as though the grants were made on dates when the market price of Citrix stock was lower than the market price on the actual grant dates, thereby unduly benefiting the recipients of the backdated options.

87.     The members of the Board who were not on the Compensation Committee had actual knowledge of the backdating and knew that it violated the terms of the Plans, APB 25 and

---

[3] Analysis results rounded off to the nearest whole decimal.

Section 162(m).  All Board members knew that the publicly reported grant dates and statements that the Company followed APB 25 and granted stock options with exercise prices not less than the fair market value of Citrix stock on the date of grant were false because the grants were, in fact, backdated.  Furthermore, the entire Board knowingly and deliberately approved the stock option backdating scheme with knowledge of its consequences, *e.g.*, its effects on Citrix's financial statements.

88.     During the Relevant Period, Defendants repeated in proxy statements that the stock option grants made during that period carried an exercise price equal to the "fair market value of the stock on the date of grant of the option."  However, Defendants concealed until 2007 that the stock option grants were, in fact, repeatedly and consciously backdated to ensure that the strike price associated with option grants was below fair market value on the date of grant.

89.     Upon information and belief, the Board members and Compensation Committee members who issued the grants, and certain Defendants (as listed herein) and others who received each grant, would review historical stock prices before issuing stock options to determine the date upon which stock prices were significantly below the current market price, and then falsify the relevant documents to make it appear as if the stock options were granted on the earlier date.

90.     As a result, the executive or director to whom the options were granted could realize the gain observed between the historical and actual grant date while the Company's records would appear to show no difference between the option price and the market price on the purported date of the grant, thereby avoiding both the reporting requirement and the additional compensation expense.

**Fiscal Year 1996 Grants**

91.     According to the Company's proxy filed April 4, 1997, the Company purportedly granted options to Defendants Roberts, Iacobucci, Passaro, Chittenden and Templeton on July 25, 1996 at an exercise price of $35.75 per share, which preceded a substantial rise in the price of the Company's stock.   The following stock options were granted to these Defendants: (1) Roberts – 100,000 shares; (2) Iacobucci – 100,000 shares; (3) Passaro – 25,000 shares; (4) Chittenden – 50,000 shares; and (5) Templeton – 50,000 shares.

92.     Applying the Merrill Lynch analysis for this option grant, *the average twenty day return is 23.66%, or 432% annualized, as compared to a negative 5.85% annualized return to investors in 1996 – a difference of 438%*.

93.     The Compensation Committee had the authority to choose the date and, in fact, did choose the date on which this stock option was granted.   The Compensation Committee approved this grant on a date after the reported grant date and knowingly used hindsight to pick the date when Citrix's stock was poised to begin a substantial rise.   The Compensation Committee knew that the Plans required them to use the fair market value on the actual date and knew that backdating to a date with a lower price violated the Plans.



Fiscal Year 1996 Stock Chart

| Fiscal Year 1996 | | | |
|---|---|---|---|
| Defendant | Purported Date of Grant | # of Underlying Securities | Exercise Price($) |
| Chittenden | 7/25/1996 | 50,000 | 35.75 |
| Iacobucci | 7/25/1996 | 100,000 | 35.75 |
| Passaro | 7/25/1996 | 25,000 | 35.75 |
| Roberts | 7/25/1996 | 100,000 | 35.75 |
| Templeton | 7/25/1996 | 50,000 | 35.75 |

**Fiscal Year 1999 Grants**

94.    According to the Company's proxy filed April 7, 2000, during fiscal year 1999, the Company purportedly granted options to Defendants Boisseau, Chittenden, Felcyn, Iacobucci and Jones on May 31, 1999 at an exercise price of $24.38, which preceded a substantial rise in the price of the Company's stock.   The following stock options were granted to these Defendants: (1) Boisseau – 60,000 shares; (2) Chittenden – 80,000 shares; (3) Felcyn – 80,000 shares; (4) Iacobucci – 200,000 shares; and (5) Jones – 120,000 shares.

95.     Applying the Merrill Lynch analysis for this option grant, *the average twenty day return is 16.37%, or 298% annualized, as compared to 153% annualized return to investors in 1999 – a difference of 145%*.

96.     In addition, according to the Company's proxy filed April 7, 2000, during fiscal year 1999, the Company also purportedly granted options to Defendants Boisseau, Chittenden and Jones on August 1, 1999 at an exercise price of $25.44, which preceded a substantial rise in the price of the Company's stock.   The following stock options were granted to these Defendants: (1) Boisseau – 60,000 shares; (2) Chittenden – 100,000 shares; and (3) Jones – 100,000 shares.

97.     Applying the Merrill Lynch analysis for this option grant, *the average twenty day return is 29.31%, or 438% annualized, as compared to 153% annualized return to investors in 1999 – a difference of 285%*.

98.     The Compensation Committee had the authority to choose the date and, in fact, did choose the date on which these stock options were granted.   The Compensation Committee approved these grants on dates after the reported grant dates and knowingly used hindsight to pick the dates when Citrix's stock was poised to begin a substantial rise.   The Compensation Committee knew that the Plans required them to use the fair market value on the actual date and knew that backdating to a date with a lower price violated the Plans.

31



**Fiscal Year 1999 Stock Chart**

| Fiscal Year 1999 | | | |
|------------------|--------------------------|----------------------------|------------------|
| **Defendant** | **Purported Date of Grant** | **# of Underlying Securities** | **Exercise Price($)** |
| Boisseau | 5/31/1999 | 60,000 | 24.38 |
| Chittenden | 5/31/1999 | 80,000 | 24.38 |
| Felcyn | 5/31/1999 | 80,000 | 24.38 |
| Iacobucci | 5/31/1999 | 200,000 | 24.38 |
| Jones | 5/31/1999 | 120,000 | 24.38 |
| Boisseau | 8/1/1999 | 60,000 | 25.44 |
| Chittenden | 8/1/1999 | 100,000 | 25.44 |
| Jones | 8/1/1999 | 100,000 | 25.44 |

## Fiscal Year 2000 Grants

99.     According to the Company's proxy filed April 9, 2001, during fiscal year 2000, the Company purportedly granted options to Defendants Jones, Urbani, Burris and Cunningham on July 23, 2000 at an exercise price of $15.69, which preceded a substantial rise in the price of the Company's stock.  The following stock options were granted to these Defendants: (1) Jones –

35,000 shares; (2) Urbani – 203,000 shares; (3) Burris – 42,000 shares; and (4) Cunningham – 85,000 shares.

100.    Applying the Merrill Lynch analysis for this option grant, ***the average twenty day return is 26.70%, or 487% annualized, as compared to negative 64% annualized return to investors in 2000 – a difference of 551%***.

101.    The Compensation Committee had the authority to choose the date and, in fact, did choose the date on which this stock option was granted.  The Compensation Committee approved this grant on a date after the reported grant date and knowingly used hindsight to pick the date when Citrix's stock was poised to begin a substantial rise.  The Compensation Committee knew that the Plans required them to use the fair market value on the actual date and knew that backdating to a date with a lower price violated the Plans.



Third Quarter 2000 Stock Chart

| Fiscal Year 2000 | | | |
|---|---|---|---|
| **Defendant** | **Purported Date of Grant** | **# of Underlying Securities** | **Exercise Price($)** |

| Jones | 7/23/2000 | 35,000 | 15.69 |
| Urbani | 7/23/2000 | 203,000 | 15.69 |
| Burris | 7/23/2000 | 42,000 | 15.69 |
| Cunningham | 7/23/2000 | 85,000 | 15.69 |

**Fiscal Year 2001 Grants**

102.     According to the Company's proxy filed April 1, 2002, during fiscal year 2001, the Company purportedly granted options to Defendant Cunningham on May 31, 2001 for 100,000 shares at an exercise price of $23.87 per share, which preceded a substantial rise in the price of the Company's stock.

103.     Applying the Merrill Lynch analysis for this option grant, ***the average twenty day return is 27.46%, or 501% annualized, as compared to 8% annualized return to investors in 2001 – a difference of 493%***.

104.     The Compensation Committee had the authority to choose the date and, in fact, did choose the date on which this stock option was granted.  The Compensation Committee approved this grant on a date after the reported grant date and knowingly used hindsight to pick the date when Citrix's stock was poised to begin a substantial rise.  The Compensation Committee knew that the Plans required them to use the fair market value on the actual date and knew that backdating to a date with a lower price violated the Plans.





| Fiscal Year 2001 | | | |
|---|---|---|---|
| Defendant | Purported Date of Grant | # of Underlying Securities | Exercise Price($) |
| Cunningham | 5/31/2001 | 100,000 | 23.87 |

105.   Each and every one of the aforementioned Citrix stock option grants was dated just before a significant increase in Citrix's stock price and/or on advantageous dates where Citrix's stock price was at or near a low stock price for the pertinent fiscal year, fiscal quarter and/or month.  The reason for the extraordinary pattern set forth in the preceding paragraphs is that the purported grant dates set forth therein were not the actual dates on which the stock option grants were made.  Rather, the Compensation Committee members, with the knowledge and approval of the other members of the Board, knowingly and deliberately backdated the stock option grants to make it appear as though the grants were made on dates when the market price of Citrix stock was lower than the market price on the actual grant dates, thereby unduly

benefiting the Defendants who received backdated Citrix stock options.   This improper backdating, which violated the terms of the Plans, resulted in stock option grants with lower exercise prices, which improperly increased the value of the stock options and improperly reduced the amounts the Defendants had to pay to the Company upon the exercise of the stock options.

### Post-SOX Fiscal Year 2003 Grants

106.   Prior to the enactment of the Sarbanes-Oxley Act of 2002 ("SOX"), Defendants were able to engage in the backdating practices described above with relative ease, because under federal law they were only required to report stock option grants to the SEC once a year.

107.   Pursuant to SOX, beginning on August 29, 2002, executives and directors were required to report stock option grants to the SEC within two days of the grant.   With this new reporting requirement in place, the stock option backdating pattern seen previously during the Relevant Period came to an end.

108.   As demonstrated in the preceding paragraphs, several of the pre-SOX option grants made to multiple directors and executives during the Relevant Period and disclosed in proxy statements were dated to coincide with particularly low stock prices, which is strongly indicative of backdating.   In addition, two of the post-SOX grants awarded in fiscal year 2003, which were not reported until the Company filed its April 2, 2004 proxy statement, were dated to coincide with a particularly low closing price.

109.   In a report released on October 20, 2006, the research firm of Glass, Lewis & Co. conducted an extensive study surrounding the belief that late Form 4 filings can be one of the signs of post-SOX stock option backdating (the "Glass Lewis Report").   Specifically, according to the Glass Lewis Report, the research firm noted that "when we find late Form 4 filings where

the price of the underlying stock increased materially between the purported grant date and the day the Form 4 was filed, we believe this raises legitimate questions about whether the grant was backdated."

110.    According to the Company's proxy filed April 2, 2004, during fiscal year 2003, the Company purportedly granted options to Defendants Burris, Hutchison, Templeton, Kruger, and Sjostrom on March 3, 2003 at an exercise price of $12.00 per share – *one of the lowest prices for the entire fiscal year*.  Furthermore, this grant preceded a substantial rise in the price of the Company's stock.

111.    Applying the Merrill Lynch analysis for this option grant, *the average twenty day return is 25.32%, or 462% annualized, as compared to 72% annualized return to investors in 2003 – a difference of 390%*.

112.    In addition, the Company's proxy filed April 2, 2004 also disclosed that the Company purportedly granted options to Defendant Henshall on April 14, 2003 for 200,000 shares at an exercise price of $14.36 per share, which also preceded a substantial rise in the price of the Company's stock.

113.    Applying the Merrill Lynch analysis for this option grant, *the average twenty day return is 32.8%, or 599% annualized, as compared to 72% annualized return to investors in 2003 – a difference of 527%*.

114.    The Compensation Committee had the authority to choose the date and, in fact, did choose the date on which this stock option was granted.  The Compensation Committee approved this grant on a date after the reported grant date and knowingly used hindsight to pick the date when Citrix's stock was poised to begin a substantial rise.  The Compensation

Committee knew that the Plans required them to use the fair market value on the actual date and knew that backdating to a date with a lower price violated the Plans.



Fiscal Year 2003 Stock Chart

| Fiscal Year 2003 | | | |
|---|---|---|---|
| **Defendant** | **Purported Date of Grant** | **# of Underlying Securities** | **Exercise Price($)** |
| Burris | 3/3/2003 | 17,500 | 12.00 |
| Hutchison | 3/3/2003 | 15,000 | 12.00 |
| Templeton | 3/3/2003 | 37,500 | 12.00 |
| Kruger | 3/3/2003 | 17,500 | 12.00 |
| Sjostrom | 3/3/2003 | 15,000 | 12.00 |
| Henshall | 4/14/2003 | 200,000 | 14.36 |

## Citrix's Backdating Comes to Light

115.   Defendants continued to conceal their illegal conduct from the investing public until January 23, 2007.  On this date, Defendants caused Citrix to file a Form 8-K with the SEC which placed Citrix among the burgeoning ranks of public companies that have engaged in the

improper backdating of stock options.  In the SEC filing, Defendants indicated that Citrix had

commenced a review of its stock options granting practices.  Specifically, Defendants caused the

Company to state:

> During the quarter, the Audit Committee of the company's Board of Directors
> began a voluntary review of the company's historical stock option granting
> practices and the related accounting. This voluntary review was initiated in light
> of news about the option practices of numerous companies across several
> industries and not in response to any governmental investigation, whistleblower
> complaint or inquiries from media organizations. The Audit Committee has
> engaged independent outside legal counsel to conduct the review.
>
> Because this review is ongoing, the company has not yet determined if it will
> need to record any non-cash adjustments to compensation expense related to prior
> stock option grants, making today's results preliminary. Specifically, the company
> does not know whether any such non-cash compensation charges would affect the
> preliminary financial results for the fourth quarter ended December 31, 2006 or
> the full year 2006 being announced today, or would be deemed material and
> require the company to restate previously issued financial statements or would
> require an adjustment to the retained earnings balance on the company's balance
> sheet. If any such charges are required, Citrix will also need to determine the
> impact of this matter on its system of internal controls.

116.    On March 2, 2007, Defendants filed a notification with the SEC indicating that

the Company would miss its filing deadline for its Annual Report on Form 10-K because of the

ongoing stock options investigation.  The notification stated as follows:

> As disclosed in Citrix Systems, Inc.'s ("Citrix") Current Report on Form 8-K filed
> with the Securities and Exchange Commission on January 23, 2007, the Audit
> Committee of Citrix's Board of Directors is conducting a voluntary review of
> Citrix's historical stock option granting practices and the related accounting
> issues, with the assistance of independent outside legal counsel. The Audit
> Committee is working to complete the stock-based compensation review in a
> timely manner. Citrix will not be in a position to file its Annual Report on Form
> 10-K for the fiscal year ended December 31, 2006 until after the completion of
> the review, which will not occur within the prescribed time period for the filing of
> such Form 10-K.

117.    Accompanying the notification, Defendants caused the Company to issue a press release announcing the late filing, in which Defendants for the first time admitted that there had been "errors" in connection with the Company's historical stock option grants:

> Citrix Systems, Inc. (Nasdaq:CTXS), the global leader in application delivery infrastructure, today reported that it will delay the filing of its Annual Report on Form 10-K for the year ended December 31, 2006 and has filed a Form 12b-25 (Notification of Late Filing) with the Securities and Exchange Commission that extends the due date for its Form 10-K to March 16, 2007. The delay is necessary due to the ongoing status of the previously announced voluntary review of Citrix's historical stock option granting practices and related accounting.
>
> Although the Audit Committee has reached no conclusions concerning the review, *the investigation has thus far identified errors in connection with stock option grants issued by Citrix during the period from 1996 through 1998*. The Audit Committee is continuing its evaluation of these and subsequent periods. Further, the independent review has found no evidence of any intentional wrongdoing by the Company's current executives. Until the voluntary review is completed, Citrix will not be able to file its Form 10-K. Citrix intends to file its Form 10-K as soon as practicable after the voluntary review is completed.

118.    Thereafter, on March 14, 2007, defendants caused Citrix to file a Form 8-K with the SEC in which Defendants announced that the Company "*had used incorrect measurement dates for accounting purposes for certain historical stock option grants issued*", that the Company will incur additional compensation expenses as a result of the improper backdating of option grants, and that the Company's financial statements and reports previously issued during the Relevant Period could no longer be relied upon and may be restated.  The 8-K stated as follows:

> As previously announced, the Audit Committee of the Board of Directors of Citrix Systems, Inc. (the "Company") is conducting a voluntary review of the Company's historical stock option granting practices from 1996 to present and the related accounting.
>
> On March 14, 2007, after discussion with the Audit Committee of its Board of Directors and its independent registered accounting firm, the Company concluded that it had used incorrect measurement dates for accounting purposes for certain historical stock option grants issued during the period under review and that it

will restate the financial statements described below. ***The Company has determined that non-cash stock-based compensation expenses should have been recorded with respect to those stock option grants and recognized over the vesting period of those options, and that the amount of such additional expenses is material***.

***The Company's previously issued financial statements and reports thereon for the fiscal years 2003, 2004 and 2005, which are included in the Company's Annual Report on Form 10-K for the year ended December 31, 2005, the Quarterly Reports on Form 10-Q filed with respect to each of those fiscal years and the financial statements included in the Company's Quarterly Reports on Form 10-Q for the first three quarters of fiscal year 2006 and all earnings press releases and similar communications issued by the Company relating to such periods should no longer be relied upon. In addition, the restatement will materially affect financial statements for fiscal years prior to 2003, and the Company will reflect those adjustments as part of the opening balances in the financial statements for the restated periods. The financial statements for fiscal years prior to 2003 should also no longer be relied upon.***

Because the Audit Committee's review is ongoing, the Company has not determined the final aggregate amount of additional non-cash stock-based compensation expense or the amount of such expense to be recorded in any specific prior period or in any future period. ***The Company has also not identified all stock option grants for which the accounting measurement dates may have been incorrectly determined. In addition, the Company expects that the expenses arising from the voluntary review, the anticipated restatements and related activities, which will be recorded in the periods incurred, will be significant.***

The Company currently expects to file its restated financial statements and to become current in its filings under the Securities Exchange Act of 1934, as amended, as soon as practicable following the completion of the Audit Committee's review.

119. On June 13, 2007, Defendants caused the Company to file a Form 8-K and issue a press release announcing the results of the Audit Committee's review. In connection with these disclosures, Defendants for the first time admitted that stock options had been backdated at Citrix. According to Defendants, the Audit Committee had determined that from 1996 until mid-1998, the Company "***followed processes and procedures that likely led to the setting of grant dates retrospectively for many stock options granted to employees and executives***." The

Company also announced that it would need to restate its financial results from fiscal years 2004 and 2005 and for the interim quarterly periods for 2005 and 2006 to reflect the additional non-cash stock-based compensation expenses and related tax effects that should have been recorded with respect to stock option grants whose accounting measurement dates are being revised.  The press release stated as follows:

> Citrix Systems, Inc. (Nasdaq:CTXS), the global leader in application delivery infrastructure, today announced that the Audit Committee of its Board of Directors reported its findings from the voluntary review into Citrix's historical stock option granting practices and related accounting that has been ongoing for approximately the last seven months. This comprehensive review was conducted by the Audit Committee, which was assisted by both independent outside legal counsel and forensic accounting consultants. The review covered option grants made to employees, executives and directors during the period from January 1996 to December 2006, consisting of approximately 200 grant dates representing over 27,000 individual option grants. The review included an extensive examination of the Company's stock option granting practices, accounting policies, related accounting records, supporting documentation and electronic data, including e-mail, as well as over 50 interviews with current and former officers, employees, members of the Board of Directors and outside professionals.

> *The Audit Committee concluded that from 1996 until mid-1998, the Company followed processes and procedures that likely led to the setting of grant dates retrospectively for many stock options granted to employees and executives*. The Audit Committee found that none of the Company's current executives were responsible for retrospective selection of grant dates during this period.

> For grants from 1996 through late-2003, the accounting issues corrected in the restatement were caused mainly by errors such as delays in obtaining written approvals of grants, incomplete adherence to grant procedures, and process deficiencies in the grant procedures. Many of the errors during this period resulted from delays in obtaining written approval of grants for which the grant dates were selected in advance. After late 2003, there were only a few issues, caused by administrative errors. After completion of its investigation, the Audit Committee concluded that there was no intentional wrongdoing by any current executive of the company in connection with the Company's stock option grants and procedures during the period under review (1996-2006).

> As a result of the voluntary review, and as previously announced by the Company, the Company intends to restate its previously issued financial statements and reports thereon for the fiscal years 2004 and 2005 and for the interim quarterly periods for 2005 and 2006 to reflect the additional non-cash

stock-based compensation expense and related tax effects that should have been recorded with respect to stock option grants whose accounting measurement dates are being revised.

The Company intends to submit a request for consultation on certain interpretive issues to the Office of Chief Accountant ("OCA") of the Securities and Exchange Commission. Because of the pending OCA consultation, the Company has not yet determined conclusively the amount of additional non-cash compensation expense to be recorded or the resulting tax impact.

As a result of the information collected by the Audit Committee during its review, management has proposed recommendations for further enhancement of the Company's equity-based compensation granting practices.

Today the Company also announced that the Nasdaq Listing Qualifications Panel, subject to certain conditions, has granted the Company an extension of time until July 30, 2007 in which to file its Annual Report on Form 10-K for the year ended December 31, 2006 and its Quarterly Report on Form 10-Q for the quarter ended March 31, 2007, all required restated and other financial statements for previous periods, and to otherwise meet all necessary listing standards of the Nasdaq Global Select Market. During the extension period, the Company's common stock will continue to be listed on the Nasdaq Global Select Market.

120.     On September 7, 2007, the Company filed its Annual Report on Form 10-K for the year ended December 31, 2006 ("2006 Form 10-K").  In the 2006 Form 10-K, Defendants caused Citrix to announce that the Audit Committee had completed its investigation of the Company's stock option granting practices and, based on the findings of the investigation, the Company had concluded that the accounting measurement dates for certain stock option grants awarded during the period December 1995 through December 2006 differed from the actual measurement dates previously used for such grants.  Specifically, out of 191 grant dates reviewed for the period December 1995 through March 2005, the Company determined revised measurement dates for 138 grant dates representing over 76 million options granted.  As a result of the backdating of grants, the Company would be forced to record a pretax cumulative charge of ***$165.7 million*** in its financial statements through December 31, 2005, with $156.3 million of

that pre-tax charge originating prior to 2004, to reflect additional stock-based compensation expenses.

121.    While Defendants represented that the Audit Committee had purportedly found no "intentional wrongdoing" by any "current" executive, Defendants did not comment on intentional wrongdoing by other executives and directors responsible for the setting of improper grant dates during the Relevant Period.  The press release stated as follows:

> Citrix Systems, Inc. (Nasdaq:CTXS), the global leader in application delivery infrastructure, announced today that it has filed its Annual Report on Form 10-K for the year ended December 31, 2006 and its Quarterly Reports on Form 10-Q for the three months ended March 31, 2007 and June 30, 2007 with the Securities and Exchange Commission. As previously announced, these reports were delayed pending the conclusion of the voluntary investigation of the Company's historical stock option granting practices and related accounting conducted by the Audit Committee of the Company's Board of Directors and a consultation on certain related interpretive issues with the Office of the Chief Accountant of the Securities and Exchange Commission. With the filing of the Annual Report and Quarterly Reports referred to above, the Company believes that it has returned to full compliance with SEC reporting requirements and Nasdaq listing requirements.
>
> As a result of the voluntary investigation, on March 14, 2007, the Company announced its intention to restate its previously issued financial statements to reflect the additional non-cash stock-based compensation expense and related tax effects with respect to stock option grants whose accounting measurement dates were revised. In the Company's Annual Report on Form 10-K for the year ended December 31, 2006, the Company restated its consolidated balance sheet as of December 31, 2005 and the related consolidated statements of income, stockholders' equity and comprehensive income and cash flows for the years ended December 31, 2005 and 2004, and each of the quarters in 2006 and 2005 to reflect such additional stock-based compensation expense and related income tax effects for stock option awards granted since late 1995 and the financial statement impact for all subsequent periods. ***Based on the findings of the voluntary investigation, the Company has recorded a pre-tax cumulative charge of $165.7 million ($120.9 million net of income taxes and other tax charges) in its consolidated financial statements through December 31, 2005 to reflect additional stock-based compensation expense.*** Of this total cumulative pre-tax charge, $156.3 million ($119.9 million net of income taxes and other tax charges) is related to the years 2003 and earlier.

122.     Defendants also caused Citrix to admit that "*to date, we have incurred significant expenses related to legal, accounting, tax and other professional services in connection with the review of our historical stock option granting practices and the related restatements, and may incur significant expenses in the future with respect to such matters, including as a result of regulatory inquiries or proceedings, litigation matters or additional cash and non-cash charges*."

123.     On November 7, 2007, Defendants caused Citrix to file its Quarterly Report on Form 10-Q for the fiscal quarter ended September 30, 2007 with the SEC.  In that filing, Defendants caused the Company to disclose that *"[s]ince the beginning of our stock option investigation on November 30, 2006 through September 30, 2007, we have incurred approximately $12.5 million in professional fees in connection with the investigation and related restatements*."

124.     Although Defendants have admitted that the Company improperly backdated grant dates of options granted during the period 1996 to mid-1998, the Company has failed to disclose the details of such improperly backdated stock options, and has not disclosed whether the practices that led to the improperly backdated options persisted beyond the disclosed period.

125.     Moreover, Defendants have never disclosed whether any backdated or misdated option grants have been cancelled, re-priced, or otherwise remediated for the benefit of the Company.

**Defendants' Dissemination of False Financial Statements**

126.     Defendants, in their capacities as officers and directors of the Company, prepared, approved and/or signed Citrix's annual and quarterly SEC reports during the Relevant Period. As officers and directors of Citrix, Defendants had a fiduciary duty to truthfully, accurately and

completely report on the Company's financial condition in the Company's periodic filings with the SEC.  Defendants, in violation of their fiduciary duties, knowingly and deliberately caused Citrix to disseminate materially false and misleading statements in the Company's periodic SEC filings.

127.    Defendants' secret stock option backdating scheme caused each of Citrix's annual and quarterly reports filed with the SEC on Forms 10-K and Forms 10-Q for the Relevant Period to materially understate Citrix's compensation expense and materially overstate the Company's net income or materially understate its net loss, because the Defendants failed to expense the "in the money" portion of Citrix's stock option grants during the period as required by APB 25.

128.    As a result of the improper backdating of stock options, the Company, with the knowledge, approval and participation of each of the Defendants:

> A.    violated the terms of the Company's shareholder-approved stock option plans by granting stock options with exercise prices less than the fair market value of the stock on the actual date of grant;
>
> B.    violated APB 25 by failing to recognize compensation expenses incurred when the improperly backdated stock options were granted;
>
> C.    violated Section 162(m) by taking tax deductions based on stock option grants that were not payable solely on account of the attainment of one or more performance goals and violated the terms of the Company's shareholder-approved stock option plans; and
>
> D.    produced and disseminated false financial statements to Citrix shareholders and the market that improperly recorded and accounted for the backdated stock option grants, and thereby understated compensation expenses and overstated net income.

129.    Citrix's financial results for the fiscal years ended in 1996 through 2006 were reported in Annual Reports on Form 10-K filed with the SEC.  Each Form 10-K was simultaneously distributed to Citrix shareholders and the investing public.  Defendants

Iacobucci, Roberts, Felcyn, Boisseau, Compton, Dow, Templeton, Goldman, Pike, Cunningham, Urbani, White, Henshall, Bogan, Morin, Demo, Sullivan and Hirji, with the knowledge that the financial statements were false and misleading, each signed at least one Form 10-K filed with the SEC between 1996 and 2006.

### The 1996 Form 10-K

130.     On March 31, 1997, the Company filed with the SEC the Company's annual report on Form 10-K for the fiscal year ended December 31, 1996 (the "1996 10-K").  The 1996 10-K was signed by Defendants Iacobucci, Roberts, Felcyn, Boisseau and Dow.  The 1996 10-K falsely reported general and administrative ("G&A") expenses for Fiscal 1996 were $4.126 million, total operating expenses were $21.71 million, net income of $18.701 million, and diluted earnings of $0.68 per share.

131.     As a direct and proximate result of the Defendants' scheme to backdate stock option grants, as described herein, the Defendants materially underreported G&A expenses for Fiscal 1996, which caused the Company's net income and earnings per share to be materially overstated.

132.     Defendants Iacobucci, Roberts, Felcyn, Boisseau and Dow knowingly approved the false statements in the 1996 10-K with the knowledge that the statements contained therein were false because they backdated the option grants and knew that they were violating APB 25 and Section 162(m).

### The 1997 Form 10-K

133.     On March 31, 1998, the Company filed with the SEC the Company's annual report on Form 10-K for the fiscal year ended December 31, 1997 (the "1997 10-K").  The 1997 10-K was signed by Defendants Iacobucci, Roberts, Templeton, Felcyn, Boisseau, Compton,

Dow and Pike.  The 1997 10-K falsely reported general and administrative ("G&A") expenses for Fiscal 1997 were $10.651 million, total operating expenses were $56.901 million, net income of $41.358 million, and diluted earnings of $0.95 per share.

134.    As a direct and proximate result of the Defendants' scheme to backdate stock option grants, as described herein, the Defendants materially underreported G&A expenses for Fiscal 1997, which caused the Company's net income and earnings per share to be materially overstated.

135.    Defendants Iacobucci, Roberts, Templeton, Felcyn, Boisseau, Compton, Dow and Pike  knowingly approved the false statements in the 1997 10-K with the knowledge that the statements contained therein were false because they backdated the option grants and knew that they were violating APB 25 and Section 162(m).

**The 1998 Form 10-K**

136.    On March 10, 1999, the Company filed with the SEC the Company's annual report on Form 10-K for the fiscal year ended December 31, 1998 (the "1998 10-K").  The 1998 10-K was signed by Defendants Iacobucci, Templeton, Felcyn, Boisseau, Compton, Dow and Goldman.  The 1998 10-K falsely reported general and administrative ("G&A") expenses for Fiscal 1998 were $20.181 million, total operating expenses were $146.45 million, net income of $61.102 million, and diluted earnings of $1.34 per share.

137.    As a direct and proximate result of the Defendants' scheme to backdate stock option grants, as described herein, the Defendants materially underreported G&A expenses for Fiscal 1998, which caused the Company's net income and earnings per share to be materially overstated.

138.    Defendants Iacobucci, Templeton, Felcyn, Boisseau, Compton, Dow and Goldman knowingly approved the false statements in the 1998 10-K with the knowledge that the statements contained therein were false because they backdated the option grants and knew that they were violating APB 25 and Section 162(m).

### The 1999 Form 10-K

139.    On March 23, 2000, the Company filed with the SEC the Company's annual report on Form 10-K for the fiscal year ended December 31, 1999 (the "1998 10-K").  The 1999 10-K was signed by Defendants Iacobucci, Templeton, Cunningham, Urbani, Compton, Dow and Goldman.  The 1999 10-K falsely reported general and administrative ("G&A") expenses for Fiscal 1999 were $37.757 million, total operating expenses were $217.202 million, net income of $116.944 million, and diluted earnings of $0.61 per share.

140.    As a direct and proximate result of the Defendants' scheme to backdate stock option grants, as described herein, the Defendants materially underreported G&A expenses for Fiscal 1999, which caused the Company's net income and earnings per share to be materially overstated.

141.    Defendants Iacobucci, Templeton, Felcyn, Boisseau, Compton, Dow and Goldman knowingly approved the false statements in the 1999 10-K with the knowledge that the statements contained therein were false because they backdated the option grants and knew that they were violating APB 25 and Section 162(m).

### The 2000 Form 10-K

142.    On March 22, 2001, the Company filed with the SEC the Company's annual report on Form 10-K for the fiscal year ended December 31, 2000 (the "2000 10-K").  The 2000 10-K was signed by Defendants Roberts, Templeton, Cunningham, Urbani, Compton, Pike,

Dow, White and Goldman.  The 2000 10-K falsely reported general and administrative ("G&A") expenses for Fiscal 2000 were $58.685 million, total operating expenses were $329.167 million, net income of $94.512 million, and diluted earnings of $0.47 per share.

143.    As a direct and proximate result of the Defendants' scheme to backdate stock option grants, as described herein, the Defendants materially underreported G&A expenses for Fiscal 2000, which caused the Company's net income and earnings per share to be materially overstated.

144.    Defendants Roberts, Templeton, Cunningham, Urbani, Compton, Pike, Dow, White and Goldman knowingly approved the false statements in the 2000 10-K with the knowledge that the statements contained therein were false because they backdated the option grants and knew that they were violating APB 25 and Section 162(m).

### The 2001 Form 10-K

145.    On March 27, 2002, the Company filed with the SEC the Company's annual report on Form 10-K for the fiscal year ended December 31, 2001 (the "2001 10-K").  The 2001 10-K was signed by Defendants Roberts, Templeton, Cunningham, Urbani, Compton, Pike, Dow, White and Goldman.  The 2001 10-K falsely reported general and administrative ("G&A") expenses for Fiscal 2001 were $85.212 million, total operating expenses were $428.43 million, net income of $105.26 million, and diluted earnings of $0.47 per share.

146.    As a direct and proximate result of the Defendants' scheme to backdate stock option grants, as described herein, the Defendants materially underreported G&A expenses for Fiscal 2001, which caused the Company's net income and earnings per share to be materially overstated.

147.    Defendants Roberts, Templeton, Cunningham, Urbani, Compton, Dow, and Goldman knowingly approved the false statements in the 2001 10-K with the knowledge that the statements contained therein were false because they backdated the option grants and knew that they were violating APB 25 and Section 162(m).

### The 2002 Form 10-K

148.    On March 24, 2003, the Company filed with the SEC the Company's annual report on Form 10-K for the fiscal year ended December 31, 2002 (the "2002 10-K").  The 2002 10-K was signed by Defendants Roberts, Templeton, Cunningham, Urbani, Compton, Pike, Dow, White and Goldman.  The 2002 10-K falsely reported general and administrative ("G&A") expenses for Fiscal 2002 were $88.946 million, total operating expenses were $404.55 million, net income of $93.92 million, and diluted earnings of $0.52 per share.

149.    As a direct and proximate result of the Defendants' scheme to backdate stock option grants, as described herein, the Defendants materially underreported G&A expenses for Fiscal 2002, which caused the Company's net income and earnings per share to be materially overstated.

150.    Defendants  Templeton, Urbani, Compton, Pike, White and Dow knowingly approved the false statements in the 2002 10-K with the knowledge that the statements contained therein were false because they backdated the option grants and knew that they were violating APB 25 and Section 162(m).

### The 2003 Form 10-K

151.    On March 12, 2004, the Company filed with the SEC the Company's annual report on Form 10-K for the fiscal year ended December 31, 2003 (the "2003 10-K").  The 2003 10-K was signed by Defendants Templeton, Henshall, Dow, Bogan, Compton, Morin, Pike and

White.  The 2003 10-K falsely reported general and administrative ("G&A") expenses for Fiscal 2003 were $85.672 million, total operating expenses were $414.2 million, net income of $126.943 million, and diluted earnings of $0.74 per share.

152.    As a direct and proximate result of the Defendants' scheme to backdate stock option grants, as described herein, the Defendants materially underreported G&A expenses for Fiscal 2003, which caused the Company's net income and earnings per share to be materially overstated.

153.    Defendants Templeton, Henshall, Dow, Bogan, Compton, Morin, Pike and White. knowingly approved the false statements in the 2003 10-K with the knowledge that the statements contained therein were false because they backdated the option grants and knew that they were violating APB 25 and Section 162(m).

## The 2004 Form 10-K

154.    On March 11, 2005, the Company filed with the SEC the Company's annual report on Form 10-K for the fiscal year ended December 31, 2004 (the "2004 10-K").  The 2004 10-K was signed by Defendants Templeton, Henshall, Dow, Bogan, Demo, Morin, Sullivan and White.  The 2004 10-K falsely reported general and administrative ("G&A") expenses for Fiscal 2004 were $106.512 million, total operating expenses were $555.743 million, net income of $131.546 million, and diluted earnings of $0.75 per share.

155.    As a direct and proximate result of the Defendants' scheme to backdate stock option grants, as described herein, the Defendants materially underreported G&A expenses for Fiscal 2004, which caused the Company's net income and earnings per share to be materially overstated.

156.    Defendants Templeton, Henshall, Dow, Bogan, Demo, Morin, Sullivan and White knowingly approved the false statements in the 2004 10-K with the knowledge that the statements contained therein were false because they backdated the option grants and knew that they were violating APB 25 and Section 162(m).

### The 2005 Form 10-K

157.    On March 14, 2006, the Company filed with the SEC the Company's annual report on Form 10-K for the fiscal year ended December 31, 2005 (the "2005 10-K").  The 2005 10-K was signed by Defendants Templeton, Henshall, Dow, Bogan, Demo, Morin, Sullivan and White.  The 2005 10-K falsely reported general and administrative ("G&A") expenses for Fiscal 2004 were $125.538 million, total operating expenses were $646.267 million, net income of $166.34 million, and diluted earnings of $0.93 per share.

158.    As a direct and proximate result of the Defendants' scheme to backdate stock option grants, as described herein, the Defendants materially underreported G&A expenses for Fiscal 2005, which caused the Company's net income and earnings per share to be materially overstated.

159.    Defendants Templeton, Henshall, Dow, Bogan, Demo, Morin, Sullivan and White knowingly approved the false statements in the 2005 10-K with the knowledge that the statements contained therein were false because they backdated the option grants and knew that they were violating APB 25 and Section 162(m).

### The First Quarter 2006 Form 10-Q

160.    On May 4, 2006, the Company filed with the SEC the Company's quarterly report on Form 10-Q for the three months ended March 31, 2006 (the "2006 First Quarter 10-Q").  The 10-Q was signed by Defendants Templeton and Henshall.  The 10-Q falsely reported general and

administrative ("G&A") expenses for the quarter ended March 31, 2006 were $38.618 million, total operating expenses were $185.247 million, net income of $44.679 million, and diluted earnings of $0.24 per share.

161.    As a direct and proximate result of the Defendants' scheme to backdate stock option grants, as described herein, the Defendants materially underreported G&A expenses for the quarter ended March 31, 2006, which caused the Company's net income and earnings per share to be materially overstated.

162.    Defendants Templeton and Henshall knowingly approved the false statements in the quarter ended March 31, 2006 10-Q with the knowledge that the statements contained therein were false because they backdated the option grants and knew that they were violating APB 25 and Section 162(m).

### The Second Quarter 2006 Form 10-Q

163.    On August 8, 2006, the Company filed with the SEC the Company's quarterly report on Form 10-Q for the three months ended June 30, 2006 (the "2006 Second Quarter 10-Q"). The 10-Q was signed by Defendants Templeton and Henshall. The 10-Q falsely reported general and administrative ("G&A") expenses for the quarter ended June 30, 2006 were $40.796 million, total operating expenses were $200.17 million, net income of $46.45 million, and diluted earnings of $0.24 per share.

164.    As a direct and proximate result of the Defendants' scheme to backdate stock option grants, as described herein, the Defendants materially underreported G&A expenses for the quarter ended June 30, 2006, which caused the Company's net income and earnings per share to be materially overstated.

165.    Defendants Templeton and Henshall knowingly approved the false statements in the quarter ended June 30, 2006 10-Q with the knowledge that the statements contained therein were false because they backdated the option grants and knew that they were violating APB 25 and Section 162(m).

### The Third Quarter 2006 Form 10-Q

166.    On November 3, 2006, the Company filed with the SEC the Company's quarterly report on Form 10-Q for the three months ended September 30, 2006 (the "2006 Third Quarter 10-Q").  The 10-Q was signed by Defendants Templeton and Henshall.  The 10-Q falsely reported general and administrative ("G&A") expenses for the quarter ended September 30, 2006 were $42.957 million, total operating expenses were $205.776 million, net income of $46.618 million, and diluted earnings of $0.25 per share.

167.    As a direct and proximate result of the Defendants' scheme to backdate stock option grants, as described herein, the Defendants materially underreported G&A expenses for the quarter ended September 30, 2006, which caused the Company's net income and earnings per share to be materially overstated.

168.    Defendants Templeton and Henshall knowingly approved the false statements in the quarter ended September 30, 2006 10-Q with the knowledge that the statements contained therein were false because they backdated the option grants and knew that they were violating APB 25 and Section 162(m).

169.    Furthermore, in its Annual Reports on Form 10-K and quarter reports on Form 10-Q filed with the SEC during the Relevant Period, the Company, with the knowledge, approval and participation of, at various times, each of Defendants Iacobucci, Roberts, Felcyn, Boisseau, Compton, Dow, Templeton, Goldman, Pike Cunningham, Urbani, White, Henshall, Bogan,

Morin, Demo, Sullivan and Hirji, falsely represented that it followed APB 25 to account for stock-based compensation, stating that the "Company applies APB Opinion 25 and Related Interpretations in Accounting for its plans and has complied with the disclosure requirements of SFAS No. 123."

170.     Additionally, despite their many statements to the contrary, as alleged herein, the Defendants did not design or implement a system of adequate controls, nor did they ever make any good faith attempt to do so.  Defendants' failure to establish adequate internal controls could not have been the exercise of valid business judgment, and it rendered all of their statements during the Relevant Period regarding their controls materially false and misleading when issued. Because Defendants made no true effort in this regard, the Company's financial reporting was inherently unreliable throughout the Relevant Period.

## False and Misleading Proxy Statements

171.     At various times during the Relevant Period, Defendants Roberts and Templeton, and non-party David R. Friedman ("Friedman") caused Citrix to disseminate to shareholders proxy statements in connection with the Company's annual shareholder meetings. These Defendants drafted, approved, reviewed and/or signed Citrix's proxy statements during the Relevant Period before the statements were filed with the SEC.  These Defendants knew, or were deliberately reckless in not knowing, that the proxy statements were materially false and misleading.

172.     The Citrix proxy statements that were sent to shareholders by the Company and the Defendants in connection with annual shareholders' meetings typically concerned the election of directors, the approval, adoption and/or amendment of Citrix's stock option plan, the authorization to reserve shares for future issuance under the stock option plans, and ratification

of the selection of Citrix's outside auditor. Each proxy statement sent to shareholders during this period contained materially false and misleading disclosures or omitted information about Citrix's stock option practices, as detailed below.

### Citrix's Fiscal Year 1997 Proxy Statement

173.     On or about April 4, 1997, Citrix filed a Form 14A proxy statement with the SEC. In the proxy statement, the Board, through the Report of its Compensation Committee (Defendants Compton and Dow), made the following representations regarding the role of the Compensation Committee and the Company's stock option plans:

> The Corporation uses its compensation program to achieve the following objectives:
>
>> - To provide compensation that attracts, motivates and retains the best talent and highest caliber people to serve the Corporation's customers and achieve its strategic objectives.
>>
>> - To align management's interest with the success of the Corporation.
>>
>> - ***To align management's interest with stockholders by including long-term equity incentives***.
>>
>> - To increase profitability of the Corporation and, accordingly, increase stockholder value.
>
> * * *
>
> Stock Options. ***The Compensation Committee believes that long-term incentive compensation, in the form of stock options, helps to align the interests of management and stockholders and enables executives to develop a long-term stock ownership in the Corporation***. In addition to an executive's past performance, the Corporation's desire to retain an individual is of paramount importance in the determination of stock option grants.
>
> When establishing stock option grant levels for executive officers, the Compensation Committee considered the existing levels of stock ownership, previous grants of stock options, vesting schedules of previously granted options and the current stock price. ***Options granted in fiscal 1996 were granted at an exercise price per share equal to the fair market value of the Common Stock, as determined by the Compensation Committee.*** The Compensation Committee

reviews option grants to executive officers on an annual basis and considers the level of outstanding options as a factor in its determinations with respect to overall compensation for each of the executive officers. For additional information regarding the grant of options, see the table under the heading "Option Grants in Last Fiscal Year."

174.    Additionally, the Fiscal 1997 Proxy Statement falsely reported July 25, 1996 as the date of stock option grants to Defendants Roberts, Iacobucci, Passaro, Chittenden and Templeton at an exercise price of $35.75 per share, and stated that the exercise price of the incentive options issued to the these Defendants was "***equal to the fair market value per share of Common Stock on the date of the grant***." These statements were materially false and misleading in light of the backdating alleged herein.

175.    The Fiscal 1997 Proxy Statement failed to report the true value of the compensation paid to Defendants Roberts, Iacobucci, Passaro, Chittenden and Templeton or that the options were backdated as alleged herein, rather than issued on the date at which the stock traded at the market value identified in the proxy statement. Thus, backdated stock options provided undisclosed compensation to the executive officers on the date of the grant.

176.    The Compensation Committee and the Board knowingly approved the false statements in the Fiscal 1997 Proxy Statement and knew that the Fiscal 1997 Proxy Statement was false and misleading because the option grants were backdated.

## Citrix's Fiscal Year 1998 Proxy Statement

177.    On or about April 3, 1998, Citrix filed a Form 14A proxy statement with the SEC. In the proxy statement, the Board, through the Report of its Compensation Committee (Defendants Compton and Dow), made the following representations regarding the role of the Compensation Committee and the Company's stock option plans:

Pursuant to authority delegated by the Board of Directors, the Compensation Committee is responsible for reviewing and administering the Corporation's stock

58

ownership plans and reviewing and approving compensation matters concerning the executive officers of the Corporation.

Overview and Philosophy. The Corporation uses its compensation program to achieve the following objectives:

- To provide compensation that attracts, motivates and retains the best talent and highest caliber people to serve the Corporation's customers and achieve its strategic objectives.

- To align management's interest with the success of the Corporation.

- *To align management's interest with stockholders by including long-term equity incentives*.

- To increase profitability of the Corporation and, accordingly, increase stockholder value.

* * *

Stock Options. *The Compensation Committee believes that long-term incentive compensation, in the form of stock options, helps to align the interests of management and stockholders and enables executives to develop a long-term stock ownership in the Corporation*. In addition to an executive's past performance, the Corporation's desire to retain an individual is of paramount importance in the determination of stock option grants.

When establishing stock option grant levels for executive officers, the Compensation Committee considered the existing levels of stock ownership, previous grants of stock options, vesting schedules of previously granted options and the current stock price. *Options granted in fiscal 1997 were granted at an exercise price per share equal to the fair market value of the Common Stock*, as determined by the Compensation Committee. The Compensation Committee reviews option grants to executive officers on an annual basis and considers the level of outstanding options as a factor in its determinations with respect to overall compensation for each of the executive officers. For additional information regarding the grant of options, see the table under the heading "Option Grants in Last Fiscal Year."

178.    In addition, the Fiscal Year 1998 Proxy Statement stated that the exercise price of the incentive options issued during 1997 was "*equal to the fair market value per share of Common Stock on the date of the grant*."

**Citrix's Fiscal Year 1999 Proxy Statement**

179.    On or about April 2, 1999, Citrix filed a Form 14A proxy statement with the SEC. In the proxy statement, the Board, through the Report of its Compensation Committee (Defendants Compton and Dow), made the following representations regarding the role of the Compensation Committee and the Company's stock option plans:

> Pursuant to authority delegated by the Board of Directors, the Compensation Committee is responsible for reviewing and administering the Corporation's stock ownership plans and reviewing and approving compensation matters concerning the executive officers of the Corporation.
>
> Overview and Philosophy. The Corporation uses its compensation program to achieve the following objectives:
>
>> - To provide compensation that attracts, motivates and retains the best talent and highest caliber people to serve the Corporation's customers and achieve its strategic objectives.
>>
>> - To align management's interest with the success of the Corporation.
>>
>> - ***To align management's interest with stockholders by including long-term equity incentives***.
>>
>> - To increase profitability of the Corporation and, accordingly, increase stockholder value.
>
> * * *
>
> Stock Options. ***The Compensation Committee believes that long-term incentive compensation, in the form of stock options, helps to align the interests of management and stockholders and enables executives to develop a long-term stock ownership in the Corporation***. In addition to an executive's past performance, the Corporation's desire to retain an individual is of paramount importance in the determination of stock option grants.
>
> When establishing stock option grant levels for executive officers, the Compensation Committee considered the existing levels of stock ownership, previous grants of stock options, vesting schedules of previously granted options and the current stock price. ***Options granted in fiscal 1998 were granted at an exercise price per share equal to the fair market value of the Common Stock***, as determined by the Compensation Committee. The Compensation Committee reviews option grants to executive officers on an annual basis and considers the level of outstanding options as a factor in its determinations with respect to overall compensation for each of the executive officers. For additional

information regarding the grant of options, see the table under the heading "Option Grants in Last Fiscal Year."

180.    In addition, the Fiscal Year 1999 Proxy Statement stated that the exercise price of the incentive options issued during 1998 was "***equal to the fair market value per share of Common Stock on the date of the grant***.

### Citrix's Fiscal Year 2000 Proxy Statement

181.    On or about April 7, 2000, Citrix filed a Form 14A proxy statement with the SEC. In the proxy statement, the Board, through the Report of its Compensation Committee (Defendants Compton and Dow), made the following representations regarding the role of the Compensation Committee and the Company's stock option plans:

> Pursuant to authority delegated by the Board of Directors, the Compensation Committee is responsible for reviewing and administering the Corporation's stock ownership plans and reviewing and approving compensation matters concerning the executive officers of the Corporation.

> Overview and Philosophy.  The Corporation uses its compensation program to achieve the following objectives:

> - To provide compensation that attracts, motivates and retains the best talent and highest caliber people to serve the Corporation's customers and achieve its strategic objectives.

> - To align management's interest with the success of the Corporation.

> - ***To align management's interest with stockholders by including long-term equity incentives***.

> - To increase profitability of the Corporation and, accordingly, increase stockholder value.

> \* \* \*

> Stock Options.  ***The Compensation Committee believes that long-term incentive compensation in the form of stock options, helps to align the interests of management and stockholders and enables executives to develop a long-term stock ownership in the Corporation***.  In addition to an executive's past

performance, the Corporation's desire to retain an individual is of paramount importance in the determination of stock option grants.

When establishing stock option grant levels for executive officers, the Compensation Committee considered the existing levels of stock ownership, previous grants of stock options, vesting schedules of previously granted options and the current stock price. ***Options granted in fiscal 1999 were granted at an exercise price per share equal to or greater than the fair market value of the Common Stock, as determined by the Compensation Committee***. The Compensation Committee reviews option grants to executive officers on an annual basis and considers the level of outstanding options as a factor in its determinations with respect to overall compensation for each of the executive officers. For additional information regarding the grant of options, see the table under the section heading "Option Grants in Last Fiscal Year."

182.   Additionally, the Fiscal Year 2000 Proxy Statement falsely reported May 31, 1999 as the date of stock option grants issued to Defendants Chittenden, Jones, Iacobucci, Felcyn and Boisseau at an exercise price of $24.38 per share, and August 1, 1999 as the date of stock option grants issued to Defendants Boisseau, Chittenden and Jones at an exercise price of $25.44 per share.  The Fiscal Year 2000 Proxy Statement stated that the exercise price of the incentive options issued to these Defendants was "***equal to or greater than the fair market value per share of Common Stock on the date of the grant***."  These statements were materially false and misleading in light of the backdating alleged herein.

183.   The Fiscal Year 2000 Proxy Statement failed to report the true value of the compensation paid to Defendants Chittenden, Jones, Iacobucci, Felcyn and Boisseau or that the options were backdated as alleged herein, rather than issued on the date at which the stock traded at the market value identified in the proxy statement.  Thus, backdated stock options provided undisclosed compensation to the executive officers on the date of the grant.

184.   The Compensation Committee and the Board knowingly approved the false statements in the Fiscal 2000 Proxy Statement and knew that the Fiscal 2000 Proxy Statement was false and misleading because the option grants were backdated.

## Citrix's Fiscal Year 2001 Proxy Statement

185.    On or about April 9, 2001, Citrix filed a Form 14A proxy statement with the SEC.

In the proxy statement, the Board, through the Report of its Compensation Committee

(Defendants Compton, Dow and White), made the following representations regarding the role

of the Compensation Committee and the Company's stock option plans:

> Pursuant to authority delegated by the Board of Directors, the Compensation Committee is responsible for reviewing and administering the Corporation's stock ownership plans and reviewing and approving compensation matters concerning the executive officers of the Corporation.

> Overview and Philosophy.  The Corporation uses its compensation program to achieve the following objectives:

> - To provide compensation that attracts, motivates and retains the best talent and highest caliber people to serve the Corporation's customers and achieve its strategic objectives.

> - To align management's interest with the success of the Corporation.

> - *To align management's interest with stockholders by including long-term equity incentives*.

> - To increase profitability of the Corporation and, accordingly, increase stockholder value.

> * * *

Stock Options.  *The Compensation Committee believes that long-term incentive compensation in the form of stock options helps to align the interests of management and stockholders and enables executives to develop a long-term stock ownership in the Corporation*. In addition to an executive's past performance, the Corporation's desire to retain an individual is of paramount importance in the determination of stock option grants.

When establishing stock option grant levels for executive officers, the Compensation Committee considered the existing levels of stock ownership, previous grants of stock options, vesting schedules of previously granted options and the current stock price. *Options granted in fiscal 2000 were granted at an exercise price per share equal to or greater than the fair market value of the Common Stock, as determined by the Compensation Committee*. The Compensation Committee reviews option grants to executive officers on an

annual basis and considers the level of outstanding options as a factor in its determinations with respect to overall compensation for each of the executive officers. For additional information regarding the grant of options, see the table under the section heading "Option Grants in Last Fiscal Year."

186.    Additionally, the Fiscal 2001 Proxy Statement falsely reported July 23, 2000 as the date of stock option grants issued to Defendants Jones, Urbani, Burris and Cunningham at an exercise price of $15.69 per share, and stated that the exercise price of the incentive options issued to these Defendants was "***equal to or greater than the fair market value per share of Common Stock on the date of the grant***."   These statements were materially false and misleading in light of the backdating alleged herein.

187.    The Fiscal 2001 Proxy Statement failed to report the true value of the compensation paid to Defendants Jones, Urbani, Burris and Cunningham or that the options were backdated as alleged herein, rather than issued on the date at which the stock traded at the market value identified in the proxy statement.   Thus, backdated stock options provided undisclosed compensation to the executive officers on the date of the grant.

188.    The Compensation Committee and the Board knowingly approved the false statements in the Fiscal 2001 Proxy Statement and knew that the Fiscal 2001 Proxy Statement was false and misleading because the option grants were backdated.

### Citrix's Fiscal Year 2002 Proxy Statement

189.    On or about April 1, 2002, Citrix filed a Form 14A proxy statement with the SEC. In the proxy statement, the Board, through the Report of its Compensation Committee (Defendants Compton, Dow and White), made the following representations regarding the role of the Compensation Committee and the Company's stock option plans:

> Pursuant to authority delegated by the Board of Directors, the Compensation Committee is responsible for reviewing and administering the Corporation's stock

ownership plans and reviewing and approving compensation matters concerning the executive officers of the Corporation.

Overview and Philosophy. The Corporation uses its compensation program to achieve the following objectives:

> - To provide compensation that attracts, motivates and retains the best talent and highest caliber executives to serve the Corporation's customers and achieve its strategic objectives.

> - To align management's interest with the success of the Corporation.

> - *To align management's interest with stockholders by including long-term equity incentives*.

> - To increase profitability of the Corporation and, accordingly, increase stockholder value.

* * *

Stock Options. *The Compensation Committee believes that long-term incentive compensation in the form of stock options helps to align the interests of management and stockholders and enables executives to develop a long-term stock ownership in the Corporation*. In addition to an executive's past performance, the Corporation's desire to retain an individual is of paramount importance in the determination of stock option grants.

When establishing stock option grant levels for executive officers, the Compensation Committee considered the existing levels of stock ownership, previous grants of stock options, vesting schedules of previously granted options and the current stock price. *Options granted in fiscal 2001 were granted at an exercise price per share equal to or greater than the fair market value of the Common Stock, as determined by the Compensation Committee*. The Compensation Committee reviews option grants to executive officers on an annual basis and considers the level of outstanding options as a factor in its determinations with respect to overall compensation for each of the executive officers. For additional information regarding the grant of options, see the table under the section heading "Option Grants in Last Fiscal Year."

190.     Additionally, the Fiscal 2002 Proxy Statement falsely reported May 31, 2001 as the date of stock option grants issued to Defendant Cunningham for 100,000 shares at an exercise price of $23.87 per share, and stated that the exercise price of the incentive options issued to Defendant Cunningham was "*equal to or greater than the fair market value per share*

*of Common Stock on the date of the grant*." These statements were materially false and misleading in light of the backdating alleged herein.

191. The Fiscal 2002 Proxy Statement failed to report the true value of the compensation paid to Defendant Cunningham or that the options were backdated as alleged herein, rather than issued on the date at which the stock traded at the market value identified in the proxy statement. Thus, backdated stock options provided undisclosed compensation to the executive officer on the date of the grant.

192. The Compensation Committee and the Board knowingly approved the false statements in the Fiscal 2002 Proxy Statement and knew that the Fiscal 2002 Proxy Statement was false and misleading because the option grants were backdated.

### Citrix's Fiscal Year 2003 Proxy Statement

193. On or about April 4, 2003, Citrix filed a Form 14A proxy statement with the SEC. In the proxy statement, the Board, through the Report of its Compensation Committee (Defendants Bogan, Compton and White), made the following representations regarding the role of the Compensation Committee and the Company's stock option plans:

> Pursuant to authority delegated by the Board of Directors, the Compensation Committee is responsible for reviewing and administering the Company's stock ownership plans and reviewing and approving compensation matters concerning the executive officers of the Company.

> *Overview and Philosophy.* The Company uses its compensation program to achieve the following objectives:

> To provide compensation that attracts, motivates and retains the best talent and highest caliber executives to serve the Company's customers and achieve its strategic objectives.

> To align management's interest with the success of the Company.

> **To align management's interest with stockholders by including long-term equity incentives**.

To increase profitability of the Company and, accordingly, increase stockholder value.

* * *

*Stock Options.* **The Compensation Committee believes that long-term incentive compensation in the form of stock options helps to align the interests of management and stockholders and enables executives to develop a long-term stock ownership in the Company**. In addition to an executive's past performance, the Company's desire to retain an individual is of paramount importance in the determination of stock option grants.

When establishing stock option grant levels for executive officers, the Compensation Committee considered the existing levels of stock ownership, previous grants of stock options, vesting schedules of previously granted options and the current stock price. **Options granted in fiscal 2002 were granted at an exercise price per share equal to or greater than the fair market value of the Common Stock**, as determined by the Compensation Committee. The Compensation Committee reviews option grants to executive officers on an annual basis and considers the level of outstanding options as a factor in its determinations with respect to overall compensation for each of the executive officers. For additional information regarding the grant of options, see the table under the section heading "Option Grants in Last Fiscal Year."

194.    In addition, the Fiscal Year 2003 Proxy Statement stated that the exercise price of the incentive options issued during 2002 was "**equal to or greater than the fair market value per share of Common Stock on the date of grant**."

### Citrix's Fiscal Year 2004 Proxy Statement

195.    On or about April 2, 2004, Citrix filed a Form 14A proxy statement with the SEC. In the proxy statement, the Board, through the Report of its Compensation Committee (Defendants Bogan, Compton and White), made the following representations regarding the role of the Compensation Committee and the Company's stock option plans:

Pursuant to authority delegated by the Board of Directors, the Compensation Committee is responsible for determining and making recommendations with respect to all forms of compensation to be granted to executive officers and employees of the Company and producing an annual report on executive compensation for inclusion in the Company's proxy statement for its Annual

Meeting of Stockholders in accordance with applicable rules and regulations. In determining and making recommendations with respect to compensation of executive officers, the Compensation Committee considers the advice of independent outside consultants in determining whether the amounts and types of compensation the Company pays its executive officers are appropriate. The Compensation Committee also (i) reviews and makes recommendations to the management of the Company on Company-wide compensation programs and practices, (ii) approves the salary, bonus and equity arrangements of the Company's Chief Executive Officer and other senior executive officers reporting directly to the Chief Executive Officer, and (iii) recommends, subject to approval by the entire Board of Directors, any equity-based plans and any material amendments thereto (including increases in the number of shares of Common Stock available for grant as stock options or otherwise thereunder) for which stockholder approval is required or desirable.

Overview and Philosophy. The Company uses its compensation program to achieve the following objectives:

> - To provide compensation that attracts, motivates and retains the best talent and highest caliber executives to serve the Company and help it to achieve its strategic objectives.

> - To align management's interest with the medium- and long-term success of the Company.

> - *To align management's interest with stockholders by including long-term equity incentives*.

> - To grow the profitability of the Company and, accordingly, increase stockholder value.

* * *

Stock Options. *The Compensation Committee believes that long-term incentive compensation in the form of stock options helps to align the interests of management and stockholders and is an important component of the Company's overall compensation scheme*. In addition to an executive's past performance, the Company's desire to retain individuals important to the strategic success of the Company is weighed heavily in the determination of stock option grants. The Compensation Committee believes that long-term incentive compensation in the form of stock options can be an extremely effective incentive for superior performance leading to long-term stockholder value.

When establishing stock option grant levels for executive officers, the Compensation Committee considers the existing levels of stock ownership, previous grants of stock options, vesting schedules of previously granted options

and the current stock price. ***Options granted in fiscal 2003 were granted at an exercise price per share equal to or greater than the market value of the Common Stock, as determined by the Compensation Committee***. The Compensation Committee reviews option grants to executive officers on an annual basis and considers the number of Company options outstanding as a factor in its determinations with respect to overall compensation for each of the executive officers. For additional information regarding the grant of options, see "Compensation and Other Information Concerning Directors and Officers — Option Grants in Last Fiscal Year."

196.    Additionally, the Fiscal 2004 Proxy Statement falsely reported March 3, 2003 as the date of stock option grants issued to Defendants Burris, Hutchison, Templeton, Kruger and Sjostrom at an exercise price of $12.00 per share, and a grant date of April 14, 2003 to Defendant Henshall at an exercise price of $14.36 per share.  In addition, the Fiscal 2004 Proxy Statement stated that the exercise price of the incentive options issued to these Defendants was "***equal to or greater than the fair market value per share of Common Stock on the date of grant***."  These statements were materially false and misleading in light of the backdating alleged herein.

197.    The Fiscal 2004 Proxy Statement failed to report the true value of the compensation paid to Defendants Burris, Hutchison, Templeton, Kruger, Sjostrom and Henshall or that the options were backdated as alleged herein, rather than issued on the date at which the stock traded at the market value identified in the proxy statement.  Thus, backdated stock options provided undisclosed compensation to the executive officer on the date of the grant.

198.    The Compensation Committee and the Board knowingly approved the false statements in the Fiscal 2004 Proxy Statement and knew that the Fiscal 2004 Proxy Statement was false and misleading because the option grants were backdated.

**Citrix's Fiscal Year 2005 Proxy Statement**

199.     On or about April 1, 2005, Citrix filed a Form 14A proxy statement with the SEC. In the proxy statement, the Board, through the Report of its Compensation Committee (Defendants Bogan, Sullivan and White), made the following representations regarding the role of the Compensation Committee and the Company's stock option plans:

> Pursuant to authority delegated by the Board of Directors, the Compensation Committee is responsible for determining and making recommendations with respect to all forms of compensation to be granted to executive officers of the Company and producing an annual report on executive compensation for inclusion in the Company's proxy statement for its Annual Meeting of Stockholders in accordance with applicable rules and regulations. The Compensation Committee has the authority to engage the services of outside advisors, experts and others to assist the Committee. In 2004 similar to prior years, the Compensation Committee considered the advice of independent outside consultants in determining the amounts and types of compensation the Company pays its executive officers. The independent outside consultant made recommendations to the Compensation Committee with respect to each executive officer's base pay, the overall incentive compensation plan arrangement and stock option grants. The Compensation Committee also (i) reviews and makes recommendations to the management of the Company on Company-wide compensation programs and practices, (ii) approves the salary, bonus, equity and other compensation arrangements of the Company's senior executive officers reporting directly to the Chief Executive Officer, (iii) recommends, subject to approval by the entire Board of Directors, the salary, bonus, equity and other compensation arrangements of the Company's Chief Executive Officer, (iv) reviews and approves the fees and retention terms of any independent experts and consultants and (v) recommends, subject to approval by the entire Board of Directors, any equity-based plans and any material amendments thereto (including increases in the number of shares of Common Stock available for grant as stock options or otherwise thereunder).

> *Overview and Philosophy.* The Company uses its compensation programs to achieve the following objectives:

> > - To provide compensation that attracts, motivates and retains the best talent and highest caliber executives to serve the Company and help it to achieve its strategic objectives.

> > - To align management's interest with the success of the Company.

> > - ***To align management's interest with stockholders by including long-term equity incentives***.

- To align compensation with the Company's quarterly operational and annual and long-term financial goals.

- To provide management with performance goals that are directly linked to the Company's annual plan for growth and profit.

\* \* \*

*Stock Options*. **The Compensation Committee believes that long-term incentive compensation in the form of stock options helps to align the interests of management and stockholders and is an important component of the Company's overall compensation scheme**. In addition to an executive's past performance, the Company's desire to retain individuals important to the strategic success of the Company is weighed heavily in the determination of stock option grants. The Compensation Committee believes that long-term incentive compensation in the form of stock options can be an extremely effective incentive for superior performance leading to long-term stockholder value.

When establishing stock option grant levels for executive officers, the Compensation Committee considers the existing levels of stock ownership among such executive officers relative to each other and to the employees of the Company as a whole, previous grants of stock options to such executive officers, vesting schedules of previously granted options, peer group benchmarks and the current stock price. **Options granted in fiscal 2004 were granted at an exercise price per share equal to the market value of the Common Stock, as determined by the Compensation Committee**. The Compensation Committee reviews all option grants to executive officers and considers the number of Company options outstanding as a factor in its determinations with respect to overall compensation for each of the executive officers. For additional information regarding the grant of options, see "Compensation and Other Information Concerning Directors and Officers—Option Grants in Last Fiscal Year."

200.    In addition, the Fiscal Year 2005 Proxy Statement stated that the exercise price of

the incentive options issued during 2004 was "**equal to the fair market value per share of**

**Common Stock on the date of grant**."

### Citrix's Fiscal Year 2006 Proxy Statement

201.    On or about April 14, 2006, Citrix filed a Form 14A proxy statement with the

SEC.  In the proxy statement, the Board, through the Report of its Compensation Committee

(Defendants Bogan, Sullivan and White), made the following representations regarding the role of the Compensation Committee and the Company's stock option plans:

> Pursuant to authority delegated by the Board of Directors, the Compensation Committee is responsible for determining and making recommendations with respect to all forms of compensation to be granted to executive officers of the Company and producing an annual report on executive compensation for inclusion in the Company's proxy statement for its Annual Meeting of Stockholders in accordance with applicable rules and regulations. The Compensation Committee also:
>
>> - reviews and makes recommendations to the management of the Company on Company-wide compensation programs and practices,
>>
>> - approves the salary, bonus, equity and other compensation arrangements of the Company's senior executive officers reporting directly to the Chief Executive Officer,
>>
>> - recommends, subject to approval by the entire Board of Directors, the salary, bonus, equity and other compensation arrangements of the Company's Chief Executive Officer,
>>
>> - reviews and approves the fees and retention terms of any independent experts and consultants, and
>>
>> - recommends, subject to approval by the entire Board of Directors, any stock-based plans and any material amendments thereto.
>
> The Compensation Committee reports on its actions and recommendations at Board meetings.
>
> *Overview and Philosophy.* The Company's compensation programs are designed to achieve the following objectives:
>
>> - to provide competitive compensation that attracts, motivates and retains the best talent and the highest caliber executives to serve the Company and help it to achieve its strategic objectives;
>>
>> - to align management's interest with the success of the Company;
>>
>> - to connect a significant portion of the total potential cash compensation paid to executives to the annual financial performance of the Company or the division, region or segment of the Company's business for which an executive has management responsibility by basing cash incentive compensation to corresponding financial targets;

*- to align management's interest with the interests of stockholders through long-term equity incentives*; and

- to provide management with performance goals that are directly linked to the Company's annual plan for growth and profit.

\* \* \*

*Long Term Incentives*. When establishing stock option grant levels for executive officers, the Compensation Committee considers the existing levels of stock ownership among such executive officers relative to each other and to the employees of the Company as a whole, previous grants of stock options to such executive officers, the Company's stock option overhang and targeted stock-option "burn" rates and vesting schedules of previously granted options in addition to the factors described above. ***Options granted in fiscal 2005 to the Company's executives were granted at an exercise price per share equal to the market value of the Common Stock on the date of each grant.***

In 2005, the Compensation Committee evaluated the Company's long-term incentive compensation practices in light of recent industry trends and new accounting and tax rules. Based on this evaluation and benchmarking of compensation practices, the Compensation Committee has decided to grant executive officers a mix of options and restricted stock awards beginning in 2006 and, in determining awards, will consider the same factors it evaluates in granting stock options. Vesting of restricted stock grants will be both time-based and performance-based, with performance measured by reference to the Company's results of operations.

202.    In addition, the Fiscal Year 2006 Proxy Statement stated that the exercise price of the incentive options issued during 2005 was "***equal to the fair market value per share of Common Stock on the date of grant, which is computed by reference to the closing price per share of Common Stock on such date***."

### Citrix's Fiscal Year 2007 Proxy Statement

203.    On or about September 17, 2007, Citrix filed a Form 14A proxy statement with the SEC.  In the proxy statement, the Board and the Compensation Committee (Defendants Bogan, Dow and Sullivan) made the following representations regarding the role of the Compensation Committee and the Company's stock option plans:

73

*Overview and Philosophy*

We believe that the quality, skills and dedication of our executive officers are critical factors that contribute directly to our operating results, thereby enhancing value for our stockholders. As a result, our compensation programs are designed to achieve the following objectives:

> - to provide competitive compensation that attracts, motivates and retains the best talent and the highest caliber executives to serve and help us to achieve our strategic objectives; and

> - to align management's interest with our stockholders' interest by:

>> - linking a significant portion of the total potential cash compensation paid to our executives to our annual financial performance or to a division, region or segment of our business for which an executive has management responsibility by basing annual cash incentive compensation to corresponding financial targets; and

>> - utilizing appropriate performance goals and long-term incentives for our equity awards.

* * *

In assessing and determining our compensation programs, the Compensation Committee:

> - reviews and makes recommendations to management on company-wide compensation programs and practices;

> - approves the salary, bonus, equity and other compensation arrangements of senior executive officers reporting directly to our President and Chief Executive Officer;

> - recommends, subject to approval by the entire Board of Directors, the salary, bonus, equity and other compensation arrangements of our President and Chief Executive Officer;

> - appoints, retains, terminates and oversees the work of any independent experts and consultants and reviews and approves the fees and retention terms thereof;

> - recommends, subject to approval by the entire Board of Directors, any stock-based plans and any material amendments thereto;

74

- evaluates our compensation philosophy and reviews actual compensation for consistency with our compensation philosophy; and

- reviews and recommends for inclusion in our annual proxy statement the Compensation Discussion and Analysis.

* * *

*Equity-Based Long-Term Incentives*

The purpose of our equity-based long-term incentives is to attract and retain talented employees, further align employee and stockholder interests, and continue to closely link employee compensation with company performance. Our equity-based long-term incentive program provides an essential component of the total compensation package offered to employees, reflecting the importance that we place on motivating and rewarding superior results with long-term and performance-based incentives.

In 2006, we began making grants to senior executive officers of both stock options and restricted stock units pursuant to our 2005 Equity Incentive Plan, or the 2005 Plan. Grants in 2006 were awarded on a semi-annual basis following our quarterly earnings releases in April and July. We believe that these combined grants of stock options and restricted stock units provide a better balance for executives and provide more effective incentives for our superior performers to remain with us and continue that performance. In deciding to move towards a mix of stock options and restricted stock units, the Compensation Committee considered our stock option burn rate, overhang, the accounting treatment of stock options versus restricted stock units under FAS 123R, the tax treatment of stock options versus restricted stock units and the competitive practices of our peer companies. Based on its review, the Compensation Committee determined that the use of restricted stock units could reduce our burn rate and overhang, lessen the effects of stockholder dilution and provides the Compensation Committee with additional flexibility in the elements and mix of our executive officers' compensation packages. In addition, the Compensation Committee reviewed the competitive practices of our peer companies and concluded that those peer companies were moving towards grants of restricted stock units, restricted stock and other similar awards.

* * *

On November 30, 2006, the Audit Committee commenced a voluntary, independent review of our historical stock option grant practices and related accounting. As a result of our voluntary review of our historical stock option grant practices, we postponed our annual option awards to our executive officers and the grant of restricted stock units in 2007 until the completion of our voluntary review.

75

204.    In addition, the Fiscal Year 2007 Proxy Statement stated that the exercise price of the incentive options issued during 2006 was "*equal to the closing price of the Common Stock on the date of grant*."

205.    All of the statements concerning the purposes of Citrix's stock option plans and the value of the stock options on the date of grant, alleged herein, were knowingly false and misleading when made.  In fact, the various members of the Compensation Committee and the Board caused the Company to backdate Citrix stock option grants to themselves and certain Company insiders, which was not permitted by the Company's stock option plans.  Contrary to the representations, as alleged herein, none of the manipulated stock options to the Defendants and others were ever approved by the shareholders, nor were shareholders ever aware of this illicit compensation.

206.    Defendants Iacobucci, Roberts, Felcyn, Boisseau, Compton, Dow, Templeton, Goldman, Pike, Cunningham, Urbani, White, Henshall, Bogan, Morin, Demo, Sullivan and Hirji prepared, approved and/or signed Citrix's annual and quarterly SEC reports during the Relevant Period.  These Defendants knowingly and deliberately caused Citrix to disseminate materially false and misleading statements in the periodic filings that Defendants prepared, approved and/or signed.

207.    The Defendants' secret stock option backdating scheme caused each of Citrix's Forms 10-K and Forms 10-Q for the Relevant Period to materially understate Citrix's compensation expense and materially overstate the Company's net income or materially understate its net loss, because the Defendants failed to expense the "in the money" portion of Citrix's stock option grants during the period as required by APB 25.

208.     At the behest of Defendants, the stock option grants were improperly backdated to make it appear as though the grants were made on dates when the market price of Citrix stock was lower than the market price on the actual grant dates.  This improper backdating, which violated the terms of the Company's stock option plans, resulted in option grants with lower exercise prices, which improperly increased the value of the options to the recipients and improperly reduced the amounts they had to pay the Company upon exercise of the options.

209.     As a result of the improper backdating of stock options, the Company, with the knowledge, approval, and participation of each of the Defendants,

a.     violated the terms of the Company's stock option plans by granting stock options with exercise prices less than the fair market value of the stock on the actual date of grant;

b.     violated GAAP by failing to recognize compensation expenses incurred when the improperly backdated options were granted;

c.     violated Section 162(m) by taking tax deductions based on stock option grants that were not payable solely on account of the attainment of one or more performance goals and violated the terms of the Company's shareholder-approved stock option plans; and

d.     produced and disseminated to Citrix shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants.

210.     Furthermore, during the Relevant Period, the Company, with the knowledge, approval, and participation of the Defendants, for the purpose and with the effect of concealing the improper option backdating, disseminated to shareholders and filed with the SEC annual reports on Form 10-K and proxy statements that falsely reported the dates of stock option grants to certain Company insiders, failed to disclose that during the Relevant Period stock options were improperly backdated, and falsely represented that the Company followed APB Opinion 25 to properly account for stock-based compensation.

## False CEO and CFO Certifications

211.    In connection with the filing of certain Annual Reports on Form 10-K during the Relevant Period, Defendants Templeton, Henshall and Urbani filed false Certifications of Chief Executive Officer and Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (the "Certification").

212.    In each Certification, Defendants Templeton, Henshall and Urbani  made certain representations with respect to the accuracy and truthfulness of the information contained therein.  For example, the Company's Form 10-K for the fiscal year ended December 31, 2003, contained the following Certification made by Defendants Templeton and Henshall:

I, Templeton/ Henshall, certify that:

I have reviewed this annual report on Form 10-K of Citrix Systems, Inc.;

Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and we have:

> Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

* * *

Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

213.    Additionally, despite their many statements to the contrary, as alleged herein, the Defendants did not design a system of adequate controls, nor did they ever make any true attempt to do so.  Defendants' failure to establish adequate internal controls could not have been the exercise of valid business judgment, and it rendered all of their statements during the Relevant Period regarding their controls materially false and misleading when issued.  Because Defendants made no true effort in this regard, the Company's financial reporting was inherently unreliable throughout the Relevant Period.

## CITRIX'S FALSE FINANCIAL REPORTING IN VIOLATION OF GAAP, SEC REGULATIONS AND IRS RULES AND REGULATIONS

214.    As a result of the Defendants' improper backdating of stock options, the Defendants caused Citrix to violate GAAP, SEC regulations and IRS rules and regulations.

215.    Citrix's financial results during the Relevant Period were included in reports filed with the SEC and in other shareholder reports. In these reports, the Defendants represented that Citrix's financial results were presented in a fair manner and in accordance with GAAP.

216.    The Defendants' representations were false and misleading as to the financial information reported, as such financial information was not prepared in conformity with GAAP, nor was the financial information "a fair presentation" of the Company's financial condition and operations, causing the financial results to be presented in violation of GAAP and SEC rules.

217.    GAAP consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the particular time.  Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17 C.F.R. § 210.4-01(a)(1), provides that financial statements filed with the SEC, which are not prepared in compliance with GAAP, are presumed to be misleading and inaccurate.

## Violations of GAAP

218.    During the Relevant Period, the Defendants caused the Company to understate its compensation expenses by not properly accounting for its stock options under GAAP and thus overstated the Company's net earnings.

219.    Under well-settled accounting principles in effect throughout the Relevant Period, Citrix did not need to record an expense for stock options granted to employees at the current market price ("at the money").  The Company was, however, required to record an expense in its financial statements for any stock options granted below the current market price ("in the money").  In order to provide Citrix executives and employees with far more lucrative "in the money" options, while avoiding having to inform shareholders about millions of dollars incurred

by the Company in compensation expenses (and without paying the IRS millions of dollars in employment taxes), the Defendants systematically falsified Company records to create the false appearance that stock options had been granted at the market price on an earlier date.

220.    Throughout the Relevant Period, Citrix accounted for stock options using the intrinsic method described in APB 25.  Under APB 25, employers were required to record as an expense on their financial statements the "intrinsic value" of a fixed stock option on its "measurement date."   A stock option that is "in the money" on the measurement date has intrinsic value, and the difference between its exercise price and the quoted market price must be recorded as compensation expense to be recognized over the vesting period of the stock option. Options that are "at the money" or out of the money on the measurement date need not be expensed.   Excluding non-employee directors, APB 25 required employers to record compensation expenses on stock options granted to non-employees irrespective of whether they were "in the money" or not on the date of grant.

### Citrix's GAAP Violations Were Material

221.    Citrix's false and misleading Relevant Period statements and omissions regarding its accounting were material, particularly in light of SEC guidance on materiality.  SEC Staff Accounting Bulletin ("SAB") Topic 1M, Materiality, summarizes GAAP definitions of materiality.   Among other items, SAB Topic 1M says: "A matter is 'material' if there is a substantial likelihood that a reasonable person would consider it important."  It also stresses that materiality requires qualitative, as well as quantitative, considerations.  For example, if a known misstatement would cause a significant market reaction, that reaction should be taken into account in determining the materiality of the misstatement.

222.    SAB Topic 1M further states:

Among the considerations that may well render material a quantitatively small misstatement of a financial statement item are –

* * *

whether the misstatement masks a change in earnings or other trends

whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise

* * *

whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability.

223.    SAB Topic 1M also says that an intentional misstatement of even immaterial items may be illegal and constitute fraudulent financial reporting.

224.    Citrix's misstatements satisfy these criteria and thus were material from both a quantitative and qualitative perspective.

### Citrix's Financial Statements Violated Fundamental Concepts of GAAP

225.    Due to these accounting improprieties, the Company presented its financial results and statements in a manner that violated GAAP, which are described by the following statements:

A.    The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB No. 28, ¶10);

B.    The principle that financial reporting should provide information that is useful to existing and potential investors and creditors and other users in making rational investment, credit and similar decisions (Financial Accounting Standards Board ("FASB") Statement of Concepts No. 1, ¶34);

C.    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1, ¶40);

D.    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to stockholders for the use of enterprise resources entrusted to it. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

E.    The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶58-59);

F.    The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶79); and

G.    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2, ¶¶95, 97).

226.    Further, the undisclosed adverse information concealed by the Defendants during the Relevant Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

**Citrix's Financial Statements Violated SEC Regulations**

227.    During the Relevant Period, Defendants caused Citrix to violate SEC regulations by failing to disclose that the Company's senior executives had been granted backdated stock options.

228.    Under SEC Regulations, Item 8 of Form 14-A and Item 11 of Form 10-K, an issuer must furnish information required by Item 402 of Regulation S-K [17 C.F.R. § 229.303]. Item 402(b) and (c) require a company to provide both a Summary Compensation Table and an

Option/SAR Grants table identifying the compensation of the named executive officers – the Company's CEO and its next four most highly paid executives.  Item 402 requires particularized disclosures involving a company's stock option grants in the last fiscal year.  In the summary compensation table, the issuer must identify in a column "other annual compensation" received by the named executives that is not properly categorized as salary or bonus, including any "[a]bove market or preferential earnings on restricted stock, options, SARs or deferred compensation" paid to the officer during the period.  Item 402(b)(2)(iii)(C)(2).  In the option grant table, the issuer must identify in a column "[t]he per-share exercise or base price of the options. . . . If such exercise or base price is less than the market price of the underlying security on the date of grant, a separate, adjoining column shall be added showing market price on the date of grant. . . ."  Item 402(c)(2)(iv).

229.    Defendants caused Citrix to violate SEC regulations by failing to disclose that the Company's named executive officers had been granted stock options with exercise prices below the market value on the date the Board, the Option Committee or the Compensation Committee approved the grant.

### Citrix's Violations of IRS Rules and Regulations

230.    During the Relevant Period, Defendants further caused Citrix to violate IRS rules and regulations due to its improper accounting for the backdated stock options.  As a result, the Company's tax liabilities were understated, exposing Citrix to potential amounts owed for back taxes, penalties and interest to the IRS for improperly reporting compensation.

231.    Defendants caused the Company to violate IRS Code § 162(m), which generally limits a publicly traded company's tax deductions for compensation paid to each of its named executive officers to $1 million unless the pay is determined to be "performance-based."  In

order for compensation to be performance-based, the Compensation Committee must have set pre-established and objective performance goals.  The goals must then be approved by the shareholders. Section 162(m) defines stock options as performance-based provided they are issued at an exercise price that is no less than the fair market value of the stock on the date of the grant.  Accordingly, properly issued stock options do not have to be taken into account in calculating whether an executive's compensation has exceeded the $1 million compensation cap.

232.    Section 162(m), known as the $1 million rule, was enacted in 1993 in order to tie top executives' soaring pay packages more closely to a company's performance.  This change in the tax law turned compensation practices for a company's top executives away from straight salary-based compensation to performance-based compensation, including stock options. According to former SEC Chairman Harvey Pitt: "What [162[m]] did was create incentives to find other forms of compensation so people could get over the $1 million threshold without running afoul of the code."

233.    Defendants caused Citrix to violate IRS Code § 162(m) by providing backdated stock options to the Company's named executive officers, which were granted with exercise prices that were less than the fair market value of the stock on the date of the grant.  As a result all of the income resulting from the exercise of the stock options must be included for purposes of calculating whether the named executive's compensation exceeds the $1 million cap for federal tax purposes.

## DEFENDANTS ARE UNJUSTLY ENRICHED BASED ON FALSE FINANCIAL RESULTS

234.    During the Relevant Period, Defendants were awarded valuable financial benefits including salaries, bonuses, and other compensation, all of which were based on the Company's purported financial results, as follows:

## Fiscal Year 1996

| Executive | Salary | Bonus | Other |
|---|---|---|---|
| Roberts | $165,000 | $105,000 | N/A |
| Iacobucci | $150,000 | $75,000 | N/A |
| Passaro | $130,000 | $12,000 | $150,000 |
| Chittenden | $130,000 | $64,500 | N/A |
| Templeton | $140,000 | $69,000 | N/A |

## Fiscal Year 1997

| Executive | Salary | Bonus | Other |
|---|---|---|---|
| Roberts | $200,000 | $125,000 | N/A |
| Iacobucci | $175,000 | $85,000 | N/A |
| Passaro | $150,000 | $75,000 | $100,000 |
| Chittenden | $150,000 | $75,000 | N/A |
| Templeton | $160,000 | $90,000 | N/A |
| Felcyn | $150,000 | $55,000 | N/A |
| Boisseau | $76,000 | N/A | N/A |

## Fiscal Year 1998

| Executive | Salary | Bonus | Other |
|---|---|---|---|
| Roberts | $230,000 | $154,590 | N/A |
| Iacobucci | $200,000 | $101,000 | N/A |
| Passaro | $175,000 | $66,950 | $120,000 |
| Chittenden | $170,000 | $94,770 | N/A |
| Templeton | $205,000 | $137,128 | N/A |
| Jones | $42,500 | $20,000 | N/A |
| Felcyn | $170,000 | $76,128 | N/A |
| Boisseau | $106,792 | N/A | N/A |

## Fiscal Year 1999

| Executive | Salary | Bonus | Other |
|---|---|---|---|
| Iacobucci | $232,500 | $83,298 | $6,868 |
| Chittenden | $190,000 | $78,398 | $1,401 |
| Templeton | $307,500 | $176,396 | $4,859 |
| Jones | $190,000 | $112,697 | N/A |
| Felcyn | $185,000 | $68,598 | $9,332 |
| Boisseau | $127,500 | $26,350 | N/A |
| Burris | $91,026 | $33,193 | N/A |

## Fiscal Year 2000

| **Executive** | **Salary** | **Bonus** | **Other** |
| --- | --- | --- | --- |
| Templeton | $371,000 | $202,566 | N/A |
| Cunningham | $327,000 | $127,530 | N/A |
| Burris | $241,008 | $171,400 | N/A |
| Jones | $225,000 | $167,063 | N/A |
| Urbani | $182,628 | $72,188 | N/A |

**Fiscal Year 2001**

| **Executive** | **Salary** | **Bonus** | **Other** |
| --- | --- | --- | --- |
| Templeton | $399,000 | $308,168 | N/A |
| Cunningham | $352,000 | $194,400 | N/A |
| Burris | $275,000 | $215,332 | N/A |
| Jones | $225,000 | $182,926 | N/A |
| Urbani | $237,000 | $86,155 | N/A |
| Kruger | $200,080 | $138,068 | N/A |
| Sjostrom | $171,428 | $108,883 | N/A |

**Fiscal Year 2002**

| **Executive** | **Salary** | **Bonus** | **Other** |
| --- | --- | --- | --- |
| Templeton | $412,333 | $245,864 | $10,371 |
| Burris | $285,333 | $200,660 | $8,080 |
| Urbani | $311,667 | $119,838 | N/A |
| Kruger | $307,333 | $159,620 | N/A |
| Sjostrom | $257,216 | $157,381 | $19,662 |

**Fiscal Year 2003**

| **Executive** | **Salary** | **Bonus** | **Other** |
| --- | --- | --- | --- |
| Templeton | $432,500 | $703,735 | $7,760 |
| Burris | $299,567 | $505,064 | $10,899 |
| Kruger | $326,427 | $387,657 | N/A |
| Sjostrom | $316,044 | $375,758 | $44,391 |
| Henshall | $196,875 | $416,732 | $56,327 |
| Hutchison | $285,000 | $337,340 | N/A |

**Fiscal Year 2004**

| **Executive** | **Salary** | **Bonus** | **Other** |
| --- | --- | --- | --- |
| Templeton | $457,750 | $422,592 | $20,217 |
| Burris | $313,325 | $229,485 | $28,185 |
| Sjostrom | $357,572 | $286,422 | $45,203 |
| Henshall | $285,312 | $200,660 | $8,080 |

**Fiscal Year 2005**

| Executive | Salary | Bonus | Other |
|-----------|--------|-------|-------|
| Templeton | $491,250 | $597,550 | $24,416 |
| Burris | $333,748 | $379,121 | $21,431 |
| Sjostrom | $347,779 | $263,597 | $66,916 |
| Henshall | $299,578 | $242,404 | $10,279 |

### Fiscal Year 2006

| Executive | Salary | Bonus | Other |
|-----------|--------|-------|-------|
| Templeton | $575,000 | N/A | $38,055 |
| Burris | $347,326 | $75,000 | $32,356 |
| Sjostrom | $360,488 | N/A | $84,754 |
| Henshall | $338,297 | N/A | $10,999 |

235.   The financial benefits described above were based on the Company's purported financial results, which turned out to be false.  Thus, because Defendants Roberts, Iacobucci, Passaro, Chittenden, Templeton, Boisseau, Jones, Urbani, Burris, Kruger, Sjostrom, Henshall, Felcyn and Hutchison were unjustly enriched at the expense of the Company, it would be improper to allow them to retain these financial benefits in light of the Company's restatement of its historical financial results.

### DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

236.   Defendants breached their fiduciary duties by:

    a.     colluding with the Compensation Committee to backdate stock option grants;

    b.     colluding with the Audit Committee to violate GAAP;

    c.     producing and disseminating to Citrix shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

    d.     filing false proxy statements and false financial statements in order to conceal the improper backdating of stock options.

237.    Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment.  Rather, it was intended to, and did, unduly benefit themselves at the expense of the Company.

238.    As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has sustained significant damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company was required to incur and loss of funds paid to the Company upon exercise of options.

<u>**DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS**</u>

239.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress defendants' breaches of fiduciary duties and unjust enrichment.

240.    Plaintiff is an owner of Citrix common stock and has been an owner of Citrix common stock at all times relevant hereto.

241.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

242.    As a result of the facts set forth herein, Plaintiff has not made any demand on the Board to institute this action against Defendants.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

243.    The Board currently consists of seven directors: Defendants Templeton, Bogan, Demo, Dow, Hirji, Morin and Sullivan.  The following directors are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action:

> A.    Defendant Templeton is directly interested in challenged financial conduct as he personally benefited from the receipt of backdated stock options challenged herein.  Thus demand was not required upon Defendant Templeton;

B.    Defendants Sullivan, Dow, and Bogan are interested because they face a substantial likelihood of liability for their conduct on the Board as a result of their integral roles in Defendants' secret backdating scheme. Defendants Sullivan, Dow, and Bogan, as members of the Compensation Committee, concealed its existence by repeatedly issuing false statements about Citrix's stock option Plans designed to hide the scheme from Citrix shareholders.  For example, in the Company's Annual Proxy Statements filed with the SEC and disseminated to shareholders during the Relevant Period, Defendants Sullivan, Dow, and Bogan each represented at various times that the exercise price of the incentive options issued during the prior fiscal year was "equal to the closing price of the Common Stock on the date of grant."  Meanwhile, the Company has now been forced to admit that option grants awarded during the Relevant Period were in fact backdated and were not issued at exercise prices equal to "*fair* market value on the date of grant."  Moreover, the Compensation Committee is responsible for, *inter alia*, setting the compensation levels of Company executives and the administration of Citrix's stock option Plans.  The Compensation Committee operates pursuant to a charter.  Under the terms of that charter, the Compensation Committee is directly responsible for establishing annual and long-term performance goals and objectives for the Company's elected officers.  Specifically, Citrix's Compensation Committee Charter provides that the primary purposes of the Compensation Committee are, *inter alia*, to: determine or recommend to the Board the compensation of the Company's executive officers and to administer of the Company's stock-based and other incentive compensation plans.  As members of the Compensation Committee during the Relevant Period, Defendants Sullivan, Dow, and Bogan had the primary responsibility of administering the backdated stock option grants that are the subject of this lawsuit.  Accordingly, their personal potential liability for the acts (and failures to act) alleged herein casts doubt about their ability to disinterestedly evaluate a demand.  Thus, demand is excused.

C.    Defendants Demo, Dow, and Morin are interested because they face a substantial likelihood of liability for their systematic failure to properly exercise their fiduciary duties as members of Audit Committee during the Relevant Period.  This inference is strongly supported by, *inter alia*, the Company's *ex post* admissions (detailed herein) that: (i) option grants were backdated at Citrix; (ii) the Board and the Compensation Committee failed to properly implement the Plans; and (iii) the Company lacked adequate internal controls for a decade.  In light of these admissions, there can be little doubt that Demo, Dow, and Morin breached their fiduciary duties and that they face a likelihood of being held personally liable for their conduct.  The option backdating scheme was perpetrated at Citrix for over a decade, and clearly the Audit Committee members (and the Board)

90

had countless opportunities to act on the "red flags" presented by Defendants' backdating activities. Defendants Demo, Dow, and Morin, however, chose not to act. This sustained and conscious failure to act is a breach of the duty of good faith. Thus, demand is excused.

D.      The Board has clearly demonstrated its unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the Company for the violations of law complained of herein. Most notably, this is evidenced by the selection of the Audit Committee, consisting of, among others, defendants Demo and Morin, to conduct the internal investigation at Citrix into stock option backdating, *i.e.,* into their very own misconduct. As stated above, it is hardly a shock that following this so-called "investigation," the Audit Committee found no "intentional wrongdoing" by any "current" Citrix insiders. The Audit Committee's specific findings, other than the grossest generalities, have been carefully hidden from Citrix stockholders and in such circumstances, Delaware law does not require a stockholder to make demand on the board of directors. It is clear that the Board members have developed professional relationships amongst each other and with the other defendants, who are their friends and with whom they have entangling financial alliances, interests and dependencies, and therefore, they are not able to and will not vigorously prosecute any such action, and in fact, have demonstrated their hostility to such an action. Thus, demand is excused.

E.      Demand is not required on Defendant Templeton (notwithstanding the fact that he is directly interested in the improperly backdated stock option grants) because his principal professional occupation is his senior executive positions with Citrix. Accordingly, Templeton is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action against the Defendants;

F.      All of the current Citrix directors authorized the filing of some or all of the Company's annual proxy statements during the Relevant Period, in support of their nomination as directors, which failed to disclose that defendants' stock option grants had been backdated. All of the Director Defendants also solicited shareholder approval of the Citrix stock option Plans (which were described in detail and included in or incorporated by reference in numerous Citrix financial filings), which misrepresented the manner in which stock options were awarded and priced. Any suit by the Board to remedy the wrongs complained of herein would expose them to a substantial likelihood of liability for securities and proxy violations, as well as breaches of fiduciary duty. The Board members are hopelessly conflicted in making a supposedly independent determination of a demand that they cause the Company to bring this action. Thus, demand is excused.

G.     All of the Board Members signed Citrix's Annual Reports on form 10-K at various times during the Relevant Period, which contained Citrix's financial results, and which failed to properly account for the backdated stock options as compensation and an expense to the Company.  As a result, the Company has been forced to restate its financial results for prior periods reported, reducing the Company's net income and earnings per share in prior periods.  Any suit by the Board members to remedy the wrongs complained of herein would expose them to a substantial likelihood of liability for securities and proxy violations, as well as breach of fiduciary duty.  Therefore, they are hopelessly conflicted in making an independent determination of a demand that they cause the Company to bring this action, and demand is excused.

H.     All of the Board members participated in, approved, or through a conscious failure to act or abdication of duty, permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Citrix shareholders and/or acting with negligence, gross negligence or recklessness disregarded the wrongs complained of herein, and therefore are not disinterested parties in the outcome of this litigation.  Thus, demand is excused.

I.     All of the Board members are interested because they face a substantial likelihood of liability in connection with their materially incomplete and misleading disclosures regarding the Company's internal investigation and recent restatement of financial results.  As set forth herein, rather than finally issuing complete and truthful disclosures regarding the stock option backdating scheme, the Board has chosen to further "cover up" the scheme.  For example, the Board has not specifically identified or taken any action against anyone who damaged the Company or was unjustly enriched by stock option backdating at Citrix.  In fact, the Board members have not disclosed which option grants were backdated or otherwise mispriced, nor have they disclosed the identities of the recipients of backdated or mispriced options.  The Board has clearly demonstrated its hostility to this action, and as such it would be totally unreasonable to expect them to disinterestedly and independently consider a demand.  Thus, demand is excused.

244.    Furthermore, demand is excused because the misconduct complained of herein was not, and could not have been, an exercise of good faith business judgment.

## COUNT I
## VIOLATIONS OF § 14(a) OF THE EXCHANGE ACT
## AGAINST ALL DEFENDANTS

245.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

246.    Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.  Specifically, the Proxy statements during the Relevant Period violated §14(a) and Rule 14a-9 because they omitted material facts, including the fact that Defendants were causing the Company to engage in an option backdating scheme, a fact which Defendants were aware of and participated in.  The Proxy Statements during the Relevant Period indicated that "the exercise price for each option is the fair market value per share of common stock on the date of the grant."

247.    In the exercise of reasonable care, Defendants should have known that the Proxy Statements were materially false and misleading.

248.    The misrepresentations and omissions in the Proxy Statements were material to Plaintiff in voting on each Proxy Statement.  The Proxy Statements were an essential link in the accomplishment of the continuation of Defendants' unlawful stock option backdating scheme, as revelations of the truth would have immediately thwarted a continuation of shareholders' endorsement of the directors' positions, the executive officers' compensation, and the Company's compensation policies.

249.    The Company was damaged as a result of the material misrepresentations and omissions in the Proxy Statements.

## COUNT II
## BREACH OF FIDUCIARY DUTY

**AGAINST DEFENDANTS**

250.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

251.    As alleged in detail herein, each of the Defendants had a fiduciary duty to refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

252.    As alleged in detail herein, Defendants breached their fiduciary duties by:

      a.      colluding to backdate stock option grants;

      b.      colluding to violate GAAP;

      c.      producing and disseminating to Citrix shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

      d.      filing false proxy statements and false financial statements in order to conceal the improper backdating of stock options.

253.    Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment.  Rather, it was intended to, and did, unduly benefit themselves at the expense of the Company.

254.    As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company was required to incur and loss of funds paid to the Company upon exercise of options.

<u>**COUNT III**</u>
**UNJUST ENRICHMENT**
**AGAINST DEFENDANTS CHITTENDEN, IACOBUCCI, PASSARO, ROBERTS, TEMPLETON, BOISSEAU, JONES, URBANI, BURRIS, CUNNINGHAM, HUTCHISON, KRUGER, SJOSTROM, HENSHALL, AND FELCYN**

255.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

256.    Defendants Chittenden, Iacobucci, Passaro, Roberts, Templeton, Boisseau, Jones, Urbani, Burris, Cunningham, Hutchison, Kruger, Sjostrom, Henshall and Felcyn were unjustly enriched by their receipt and retention of backdated stock option grants, as alleged herein, and it would be unconscionable to allow them to retain the benefits thereof.

257.    To remedy this unjust enrichment, the Court should order these Defendants to disgorge to the Company all of the backdated stock options they received, including the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized.

<u>COUNT IV</u>
<u>ACCOUNTING</u>

258.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

259.    At all relevant times, Defendants, as directors and/or officers of Citrix, owed the Company and its shareholders fiduciary duties of good faith, care, candor and loyalty.

260.    In breach of their fiduciary duties owed to Citrix and its shareholders, the Defendants caused Citrix to grant backdated stock options to themselves and/or certain other officers and directors of Citrix.

261.    Defendants possess complete control over their improperly issued stock option grants and the books and records of the Company concerning the details of such improperly backdated stock option grants to Defendants.

262.    As a result of Defendants' misconduct, Citrix has been substantially injured and damaged financially and is entitled to a recovery as a result thereof, including the proceeds of those improperly granted options which have been exercised and sold.

95

263.    Plaintiff demands that an accounting be made of all stock option grants made to Defendants and all other Citrix directors, including without limitation, the dates of the grants, the amounts of the grants, the value of the grants, the recipients of the grants, the exercise date of stock options granted, as well as the disposition of any proceeds received by Defendants via sale or other exercise of backdated stock option grants received by the Defendants.

## COUNT V
## ABUSE OF CONTROL
## AGAINST THE DEFENDANTS

264.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

265.    The Defendants employed the alleged scheme for the purpose of maintaining and entrenching themselves in their positions of power, prestige and control at Citrix, and to continue to receive the substantial benefits and salaries associated with their positions at Citrix.

266.    Defendants' conduct constituted an abuse of their ability to control and influence Citrix.

267.    By reason of the foregoing, Citrix has been damaged.

## COUNT VI
## GROSS MISMANAGEMENT
## AGAINST THE DEFENDANTS

268.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

269.    Defendants owed a duty to Citrix and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of Citrix.

270.     Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties to prudently manage the business of Citrix in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence, and candor in the management and administration of Citrix's affairs and in the use and preservation of Citrix's assets.

271.     During the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused Citrix to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to Citrix, thus breaching their duties to the Company.  As a result, Defendants grossly mismanaged Citrix.

272.     By reason of the foregoing, Citrix has been damaged.

**COUNT VII**
**CONSTRUCTIVE FRAUD**
**AGAINST THE DEFENDANTS**

273.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

274.     As corporate fiduciaries, Defendants owed Citrix and its shareholders a duty of candor and full accurate disclosure regarding the true state of Citrix's business and assets and their conduct with regard thereto.

275.     As a result of the conduct complained of, Defendants made, or aided and abetted the making of, numerous misrepresentations to and/or concealed material facts from Citrix's shareholders despite their duties to disclose the true facts regarding their stewardship of Citrix. Thus they have committed constructive fraud and violated their duty of candor.

276.    By reason of the foregoing, Citrix has been damaged.

## COUNT VIII
## CORPORATE WASTE
## AGAINST THE DEFENDANTS

277.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

278.    By failing to properly consider the interests of the Company and its public shareholders, by failing to conduct proper supervision, and by giving away millions of dollars to Defendants and others via the options backdating scheme, Defendants have caused Citrix to waste valuable corporate assets.

279.    As a result of Defendants' corporate waste, they are liable to the Company.

## COUNT IX
## RESCISSION
## AGAINST DEFENDANTS CHITTENDEN, IACOBUCCI, PASSARO, ROBERTS, TEMPLETON, BOISSEAU, JONES, URBANI, BURRIS, CUNNINGHAM, HUTCHISON, KRUGER, SJOSTROM, HENSHALL, AND FELCYN

280.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

281.    As a result of the acts alleged herein, the stock option contracts between Defendants Chittenden, Iacobucci, Passaro, Roberts, Templeton, Boisseau, Jones, Urbani, Burris, Cunningham, Hutchison, Kruger, Sjostrom, Henshall and Felcyn and Citrix entered into during the Relevant Period were obtained through Defendants' fraud, deceit, and abuse of control. Further, the backdated stock options were illegal grants and thus invalid as they were not authorized in accordance with the terms of the publicly filed contracts regarding the Iacobucci and Roberts' employment agreements and the Company's stock option plan which was also approved by Citrix shareholders and filed with the SEC.

282.     All contracts which provide for stock option grants between these Defendants and Citrix and were entered into during the Relevant Period should, therefore, be rescinded, with all sums paid under such contracts returned to the Company, and all such executory contracts cancelled and declared void.

**COUNT X**
**BREACH OF CONTRACT**
**AGAINST DEFENDANTS CHITTENDEN, IACOBUCCI, PASSARO, ROBERTS, TEMPLETON, BOISSEAU, JONES, URBANI, BURRIS, CUNNINGHAM, HUTCHISON, KRUGER, SJOSTROM, HENSHALL, AND FELCYN**

283.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

284.     As a result of the backdating of stock options granted to them, Defendants Chittenden, Iacobucci, Passaro, Roberts, Templeton, Boisseau, Jones, Urbani, Burris, Cunningham, Hutchison, Kruger, Sjostrom, Henshall and Felcyn have breached their employment agreements with Citrix and violated the stock option plans, all of which provide that the exercise price of all of the stock options would be equal to or greater than the fair market value of the stock on the date of grant of the option.

285.     Citrix and its shareholders have been damaged by Defendants Chittenden, Iacobucci, Passaro, Roberts, Templeton, Boisseau, Jones, Urbani, Burris, Cunningham, Hutchison, Kruger, Sjostrom, Henshall and Felcyn's breach of contract.

WHEREFORE, Plaintiff demands judgment as follows:

(a)     Against Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

(b)     Ordering certain Defendants to disgorge to the Company all of the backdated stock options they received, including the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized;

(c)     Granting appropriate equitable relief to remedy Defendants' breaches of fiduciary duties;

(d)     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and any other relief the Court deems proper.

**JURY DEMAND**

Plaintiff hereby demands a jury trial.

Dated January 15, 2008                                    By: /s/Maya S. Saxena

                                                         SAXENA WHITE P.A.
                                                         Maya S. Saxena
                                                         Fla. Bar No. 0095494
                                                         msaxena@saxenawhite.com
                                                         Joseph E. White III
                                                         Fla. Bar No. 621064
                                                         jwhite@saxenawhite.com
                                                         Christopher S. Jones
                                                         Fla. Bar No. 0306230
                                                         cjones@saxenawhite.com
                                                         2424 North Federal Highway
                                                         Suite 257
                                                         Boca Raton, FL 33431
                                                         Tel.: 561-394-3399
                                                         Fax: 561-394-3382

                                                         THE WEISER LAW FIRM, P.C.
                                                         Robert B. Weiser
                                                         121 N. Wayne Avenue
                                                         Suite 100
                                                         Wayne, PA 19087
                                                         Tel.: 610-225-2677
                                                         Fax: 610-225-2678

                                                         **Counsel for Plaintiff**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on January 15, 2008 I electronically filed the foregoing document

with the Clerk of the Court using the CM/ECF system, which will send notification of such filing

to all registered users.

<u>*/s/ Maya S. Saxena*</u>
Maya S. Saxena

## <u>CITRIX SYSTEMS, INC. AMENDED VERIFICATION</u>

I, Bruce Rappaport, hereby verify that I am familiar with the allegations in the

Amended Complaint, and that I have authorized the filing of the Amended Complaint, and that

the foregoing is true and correct to the best of my knowledge, information and belief.

DATE: 12/14/07                         **BRUCE RAPPAPORT**